**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SUSAN DOUGLAS,

PAUL ROMANO,

    *Plaintiffs*,

    v.

NATIONAL PARK SERVICE,

    1849 C Street, NW
    Washington, DC 20240,

JESSICA BOWRON, *in her official capacity as Acting Director of the National Park Service*,

    1849 C Street, NW
    Washington, DC 20240,

JEN NERSESIAN, *in her official capacity as Regional Director, National Capital Region, National Park Service*,

    1100 Ohio Drive, SW
    Washington, DC 20242,

UNITED STATES DEPARTMENT OF THE INTERIOR,

    1849 C Street, NW
    Washington, DC 20240,

DOUG BURGUM, *in his official capacity as Secretary of the United States Department of the Interior*,

    1849 C Street, NW
    Washington, DC 20240,

    *Defendants*.

Civil Action No. _____

1

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      On June 14, 2026, for the first time in this nation's history, a live sporting event will be held on the White House grounds—or at least it will if President Donald J. Trump has his way. Trump's administration has authorized the Ultimate Fighting Championship ("UFC"), a mixed martial arts promotion, to put on a night of cage fights on the South Lawn. The plan is for fighters to conduct the ceremonial weigh-ins and face-offs at the Lincoln Memorial, make pre-fight walkouts from the Oval Office, and do combat in a massive structure now under construction just steps from the Executive Residence.

2.      This plan is deeply corrupt. The event, billed as "UFC Freedom 250," is (as the name suggests) being organized by the UFC, whose chief executive, Dana White, is a close friend and ally of the President. The President is giving White and his company what none have enjoyed before: unfettered access to the White House and Lincoln Memorial to stage a private, for-profit sports event, with all the promotional and branding opportunities that accompany such access.

3.      The UFC is not being coy about the event's pecuniary nature. One executive recently called it "the greatest earned-marketing tool of all time." And he is far from the only one salivating at the business upside. Recent reporting has revealed that the UFC itself is selling VIP packages for between $1 million and $1.5 million per head. Recent reporting likewise has revealed that sponsors, like Singaporean cryptocurrency exchange Crypto.com, are clambering over each other to see their brands plastered adjacent to the Executive Residence and Reflecting Pool. And the UFC's broadcast partner, Paramount Skydance—which is run by two other Trump allies, Larry and David Ellison—has decided that no American will be able to take in this "celebration of America" without first paying $8.99 plus tax for a Paramount Plus streaming subscription.

4.      Trump, too, has plans to benefit financially: Reporting published in late May revealed that earlier this spring, he purchased up to $50,000 worth of stock in TKO, UFC's owner.

5.      The ostensible occasion for this spectacle is the semiquincentennial. Dana White says that the aim is to "to celebrate the 250th birthday of America." Although June 14, 2026, will also be Trump's 80th birthday, White has steadfastly maintained that the timing is just a coincidence.

6.      White has good reason to stick to his story. Federal law tightly restricts private use of the national capital's most sacred monumental spaces, which are national parklands. Under the National Park Service's ("NPS" or "Park Service") usual permitting regime, no special events of any sort, including any sporting events, may be held on the South Lawn or at the Lincoln Memorial. Nor may structures be erected on the South Lawn without express authorization from Congress and a thorough environmental review.

7.      To authorize UFC Freedom 250 in the face of these constraints, Trump's administration appears to be relying on an NPS temporary rule enacted for the semiquincentennial. Under that temporary rule, the Park Service may disregard its usual permitting regime and authorize "special events planned, organized, and executed by executive departments and agencies or the Semiquincentennial Commission for the celebration of the 250th anniversary of American Independence" to occur on D.C.'s monumental grounds.

8.      Plaintiffs bring this case because recent revelations, including in particular reporting published on June 4, 2026, have made clear that UFC Freedom 250 does not satisfy the conditions for authorization under the temporary rule. The event is neither "for the celebration of the 250th anniversary of American Independence" nor, crucially, being "planned, organized, and executed" by the federal government.

9.      Rather, UFC Freedom 250 is a private, for-profit sporting event being "planned, organized, and executed" by the UFC, its broadcast partners, and its advertisers, not by the federal government. And it is not in any material sense a "celebration of the 250th anniversary of American Independence"—it is, instead, a celebration of the UFC's brand and the 80th anniversary of Donald Trump's birth. For these reasons, UFC Freedom 250 does not satisfy the strict conditions that must be satisfied for special semiquincentennial events to occur on the South Lawn or at the Lincoln Memorial.

10.     Defendants' decision authorizing the structures currently being erected to host UFC Freedom 250 was likewise unlawful. In particular, the UFC is erecting a 92-foot-tall, 600-ton steel structure it calls "the Claw" immediately adjacent to the Executive Residence, and is destroying much of the South Lawn in the process.

11.     Any erection of structures on national monumental grounds must be expressly authorized by Congress, and, insofar as it constitutes a major federal action, must undergo thorough National Environmental Policy Act ("NEPA") review. No agency temporary rule may displace these requirements, neither of which has been satisfied.

12.     Plaintiffs are individuals who are being harmed by Defendants' unlawful acts. Plaintiff Susan Douglas is a senior citizen activist and organizer who is suffering aesthetic, physical, expressive, and procedural harms as a result of Defendants' unlawful acts. Plaintiff Paul Romano is a Vietnam War veteran who is suffering aesthetic, dignitary, and procedural harms as a result of Defendants' unlawful acts.

13.     Plaintiffs bring this case to seek judicial relief for their injuries, uphold the rule of law, and protect our nation's most cherished monuments from corrupt exploitation.

**PARTIES**

14.     Plaintiff Susan Douglas is a retired government employee, activist, organizer, and resident of Alexandria, Virginia. She frequently organizes and attends protests and other events on the National Mall, at the Lincoln Memorial, and near the White House, and has protested and testified against alterations to DC's monumental landscape.

15.     Plaintiff Paul Romano is a retired Air Force Sergeant and veteran of the Vietnam War, a former police officer with the Department of Defense, and a resident of Arlington, Virginia. He frequently travels along the National Mall and past the White House and Lincoln Memorial as part of his part-time work as a rideshare driver, and he has protested and testified against alterations to DC's monumental landscape.

16.     Defendant National Park Service is a bureau within the United States Department of the Interior. The Park Service administers the White House and President's Park, the National Mall, and the memorials of the National Capital Region, and is the agency responsible for issuing special-event permits and commercial-use authorizations on those lands.

17.     Defendant Jessica Bowron is the Acting Director of the National Park Service. The Director is sued in her official capacity.

18.     Defendant Jen Nersesian is the Regional Director of the National Capital Region of the National Park Service, the official with immediate responsibility for permitting decisions affecting the lands at issue. The Regional Director is sued in her official capacity.

19.     Defendant United States Department of the Interior is the federal department within which the Park Service sits and which holds ultimate authority over the administration of the lands at issue.

20.     Defendant Doug Burgum is the United States Secretary of the Interior. The Secretary is sued in his official capacity.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over this action under 28 U.S.C. § 1331 because the claims alleged arise under the laws of the United States, including the Administrative Procedure Act, 5 U.S.C. §§ 701–06; the National Park Service's Organic Act, 40 U.S.C. § 8106; and the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*

22.    This Court may grant declaratory and injunctive relief under 28 U.S.C. §§ 2201–02, under 5 U.S.C. §§ 705–06, and as a matter of its inherent authority.

23.    This Court has personal jurisdiction over Defendants, who are agencies and officers of the United States sued in their official capacities pursuant to Federal Rule of Civil Procedure 4(i).

24.    Venue is proper in this District under 28 U.S.C. § 1391(b) and (e). Defendants are agencies and officers of the United States sued in their official capacities; a substantial part of the events giving rise to Plaintiffs' claims occurred in this District; and the real property that is the subject of this action is situated in this District.

## GENERAL ALLEGATIONS

I.    **The South Lawn, President's Park, Lincoln Memorial, and the National Mall are protected federal parklands at the symbolic heart of the Nation's capital.**

25.    President's Park comprises the White House and its grounds, including the South Lawn, Lafayette Park, and the Ellipse, together with the surrounding sidewalks.

26.    Despite its name, President's Park does not belong to the President, and may not be exploited as his whims dictate.

27.    Rather, President's Park is a unit of the National Park System administered by the National Park Service.

6

28.    The National Mall and Lincoln Memorial are likewise administered by the National Park System as a part of its National Mall and Memorial Parks group.

29.    Like all national parklands, these cherished national spaces are held and managed in trust for the public.

30.    Under the National Park Service's Organic Act, the Service must manage the lands in its care so as to "conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a).

## II.    Federal law and NPS regulations strictly limit private use of the Capital's national monumental spaces.

31.    To preserve the sanctity and character of Washington's national monumental spaces, including President's Park and the Lincoln Memorial, federal law and regulations strictly limit their uses.

32.    *First*, under 36 C.F.R. § 7.96, the Park Service's overarching regulation for the National Capital Region (the "Capital Region Regulation"), strict permitting restrictions apply to "special events," a defined term that includes all "sports events." 36 C.F.R. § 7.96(g)(1)(ii).

33.    In general, "special events may be held only pursuant to a permit issued in accordance with [the Capital Region Regulation]." 36 C.F.R. § 7.96(g)(2).

34.    With respect to "the White House area," "[n]o permit may be issued authorizing special events" unless the event (i) is held at the Ellipse or (ii) is the annual commemorative wreath-laying ceremony in Lafayette Park. 36 C.F.R. § 7.96(g)(3)(i).

35.    The Capital Region Regulation defines the "White House area" as the area bounded by Constitution Ave. NW to the south, H St. NW to the north, 15th St. NW to the east, and 17th

7

St. NW to the west. 36 C.F.R. § 7.96(g)(1)(iv). Those boundaries encompass the entirety of President's Park, including the South Lawn.

36.    With respect to the Lincoln Memorial "special events are not allowed" under any circumstances, with the single exception of the "official annual commemorative Lincoln birthday ceremony." 36 C.F.R. § 7.96(g)(3)(ii)(B).

37.    Permits for special events are issued by the Regional Director. 36 C.F.R. § 7.96(g)(3), (5)(v). The Regional Director is required to base the determination to issue a permit on, among other criteria, "[w]hether the activities contemplated for the proposed special event are in conformity with all applicable laws and regulations." 36 C.F.R. § 7.96(g)(5)(v)(E).

38.    Under the Capital Region Regulation, certain "temporary structures" may be erected "in connection with permitted… special events," but such structures must satisfy strict purpose, preservation, and durational requirements. 36 C.F.R. § 7.96(g)(5)(vi).

39.    *Second*, under 40 U.S.C. § 8106, a provision of the Park Service's Organic Act, no "building or structure" may be "erected" on "any reservation, park, or public grounds of the Federal Government in the District of Columbia" except insofar as authorized by Congress.

40.    *Third*, under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C), before undertaking any "major Federal action significantly affecting the quality of the human environment," the responsible official must prepare either an environmental assessment or a more comprehensive environmental impact statement.

41.    A "major Federal action" is any action that the responsible agency "determines is subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A). When "the level of federal involvement in [a] nonfederal project amounts to the creation of a joint venture or partnership between the federal agency and a non-federal entity, federal courts have considered

the arrangement to be a major federal action." *Sierra Club v. DOA*, 777 F. Supp. 2d 44, 60 (D.D.C. 2011).

**III.    A Park Service temporary rule exempts certain government-run "America250" events from usual regulatory requirements—but only those events, and without displacing limits on erection of structures or waiving environmental review.**

42.    On June 17, 2025, NPS published a temporary rule titled "National Capital Region; America250 Events." 90 Fed. Reg. 25,498 (June 17, 2025) (RIN 1024-AF06; Docket NPS-2025-0004) (the "America250 Rule").

43.    The America250 Rule rests on Executive Order 14189 (Jan. 29, 2025), titled "Celebrating America's 250th Birthday."

44.    The America250 Rule purports to exempt certain semiquincentennial events from limits in the Capital Region Regulation.

45.    To create that exemption, the America250 Rule added a new subsection, 36 C.F.R. § 7.96(g)(8), to the Capital Region Regulation (the "America250 Exemption").

46.    As relevant here, the America250 Exemption provides: "The restrictions, limitations, closures, prohibitions, priority use designations, and other requirements for special events . . . do not apply to the 'America250' events, which are those special events planned, organized, and executed by executive departments and agencies or the Semiquincentennial Commission for the celebration of the 250th anniversary of American Independence."

47.    The America250 Exemption provides a table of requirements affected. Among other items, that table includes "[t]he prohibition on issuing permits for special events in the White House area," "[t]he prohibition on issuing permits for special events within portions of the Washington Monument, Lincoln Memorial, Jefferson Memorial, and Vietnam Veterans Memorial," and "[r]estrictions on the placement of stages and sound amplification equipment at the Vietnam Veterans Memorial."

48.    By its plain terms, the America250 Exemption applies only to America250 events that are "planned, organized, and executed by executive departments and agencies or the Semiquincentennial Commission."

49.    By its plain terms, the America250 Exemption applies only to events "for the celebration of the 250th anniversary of American Independence."

50.    In other words, the Exemption does not reach events planned, organized, or executed by private parties. Nor does it reach events held for private commercial purposes, or for that matter, for any purposes other than celebration of the semiquincentennial.

51.    The America250 Rule does not purport to displace the congressional authorization requirement for erected structures under 40 U.S.C. § 8106—nor could it, as a temporary rule may not contradict a duly enacted federal statute.

52.    The America250 Rule also does not waive the requirements of the National Environmental Policy Act.

53.    To the contrary, the National Park Service has confirmed that each permit issued under the Rule "will be subject to the appropriate NEPA process at that time," and has claimed a categorical exclusion for the Rule itself on the ground that the Rule "do[es] not directly authorize any activity." The obligation to conduct NEPA review therefore attaches to each individual special event permit.

## IV.    The Ultimate Fighting Championship is a mixed martial arts promotion that holds live-action cage-fighting events.

54.    Mixed martial arts ("MMA") is a combat sport that combines elements of boxing, kickboxing, clinch fighting, stand-up grappling (particularly American folkstyle wrestling), ground grappling (particularly Brazilian jiu jitsu), and ground strikes.

10

55. An MMA bout may conclude in one of several ways. During live action, a fighter may lose by knockout (when rendered unconscious or otherwise incapacitated), by technical knockout (when, in the referee's or the ringside doctor's judgment, the fighter has suffered too much damage to safely continue fighting), or by submission (when the fighter taps out to avoid being choked unconscious or injured by a joint lock).

56. If an MMA fight does not conclude in one of those ways, its outcome is decided by ringside judges who pick a winner, most often by using a round-by-round "10-point must" system. Professional MMA fights are typically scheduled for three five-minute rounds, except for title fights, which are typically scheduled for five five-minute rounds.

57. MMA is notably *not* a form of scripted professional wrestling. The action—and the damage inflicted by and on the fighters—is entirely real.

58. The Ultimate Fighting Championship, or UFC, is one of several American MMA promotion companies, and by far the largest in terms of market share.

59. The UFC is owned and controlled by TKO Group Holdings, Inc. ("TKO"), a publicly traded corporation that also owns World Wrestling Entertainment, a professional wrestling company.

60. The UFC holds its fights inside its proprietary "Octagon," an octagonal cage made out of six-foot-tall vinyl-coated chain-link fencing. During active fighting, only the two fighters and a referee, who may stop the fight, are allowed inside the Octagon.

V. **President Trump has arranged for the UFC to stage an event on the White House South Lawn on his 80th birthday.**

61. This case arises because President Trump has arranged for the UFC to stage an MMA event on the South Lawn of the White House.

62. That event, styled "UFC Freedom 250," is scheduled for Sunday, June 14, 2026.

63.    The fight card is scheduled to feature seven MMA bouts, culminating with two title fights. The fighters competing in those two "main event" bouts will start their walkouts inside the Oval Office itself.

64.    UFC President and CEO Dana White is a longtime friend and ally of Trump's, and introduced Trump before Trump's speech to the 2024 Republican National Convention. Trump, for his part, routinely attends UFC events as White's guest.

65.    June 14 happens to be Trump's 80th birthday.

66.    Despite the notable date, and notwithstanding his intimate relationship with Trump, White has stridently denied that UFC Freedom 250 is meant to be a birthday celebration for the President. Instead, White has presented the event as a celebration of "the 250th birthday of America."

67.    White has, however, admitted that the event was "Trump's idea."

68.    A review of past event dates suggests that the UFC overwhelmingly holds its domestic events on Saturday nights, not Sunday nights. This is not surprising—UFC events often end well after midnight Eastern time. Accordingly, the UFC has not held a Sunday night event in the United States in nearly seven years. The last such event would appear to be "UFC on ESPN: Ngannou v. Velasquez," which aired on Sunday, February 17, 2019.

69.    July 4, 2026, is a Saturday on a holiday weekend, and, unlike Sunday, June 14, is America's actual "250th birthday." Yet the UFC is not holding an event on that date, whether at the White House or anywhere else.

## VI.    The UFC is constructing a massive structure on the South Lawn of the White House.

70.    On May 26, 2026, the UFC began constructing a massive structure to house the UFC Freedom 250 event on the White House South Lawn:



*The Claw under construction*

71.     White has referred to this structure as "the Claw."

72.     The Claw, which is constructed primarily out of steel, is 92 feet tall, 154 feet wide, and weighs 600 tons.

73.     The White House Executive Residence, by contrast, is only 70 feet tall at its highest point. The Claw thus dwarfs the adjacent White House. It is visible from the National Mall to the south.

74.     The Claw's principal function is to house the Octagon and provide anchor points for cameras and lighting. It will serve no obvious function once the event has concluded.

75.     Nevertheless, on June 3, 2026, President Trump posted a video on TikTok in which he suggested that the Claw may "never" be taken down. Trump analogized the Claw to Paris's Eiffel Tower, which, in his words "was supposed to be taken down immediately after the World's Fair, and then they said, you know, we sort of like it."

76.    To facilitate construction and other preparations for the event, the Park Service has imposed a 36 C.F.R. § 1.5 temporary closure of "the Ellipse and its side panels, roadways and sidewalks, E Street and its sidewalks between 15th-17th Streets, First Division Monument and State Place, Sherman Park, Hamilton Place, and the White House Sidewalk and Lafayette Park." That closure went into effect on May 20 and will remain in place until June 28.

77.    Construction of the Claw, and other facilities for the event, is causing significant damage to the White House grounds. White has estimated that it will cost $700,000 to repair the South Lawn alone.

78.    On information and belief, the Park Service has not prepared an environmental assessment or environmental impact statement to assess the resulting damage. Plaintiffs have not been able to identify any such assessment on any public docket.

**VII.    The UFC plans to hold the UFC Freedom 250 weigh-ins at the Lincoln Memorial.**

79.    Along with the nearby war memorials and Arlington National Cemetery, the Lincoln Memorial is one of the American republic's most sacred monuments.

80.    The Memorial's dedication statement, inscribed directly over President Lincoln's statue, reads, "In this temple, as in the hearts of the people, for whom he saved the Union, the memory of Abraham Lincoln is enshrined forever."

81.    The Memorial's South Chamber is inscribed with Lincoln's Address at Gettysburg, which closes with the promise that "government of the people, by the people, for the people, shall not perish from the Earth."

82.    The Memorial's North Chamber is inscribed with Lincoln's Second Inaugural Address, which closes with Lincoln's exhortation to a war-weary nation: "With malice toward none, with charity for all, with firmness in the right as God gives us to see the right, let us strive on to finish the work we are in, to bind up the nation's wounds, to care for him who shall have

14

borne the battle and for his widow and his orphan, to do all which may achieve and cherish a just and lasting peace among ourselves and with all nations."

83.    The Memorial's eighteenth step bears a marker indicating the precise spot from which Dr. Martin Luther King Jr. delivered his "I Have a Dream" oration during the 1963 March on Washington.

84.    The Lincoln Memorial is part of a larger commemorative complex that also includes the Vietnam Veterans Memorial—a monument to the American fallen in another war—located just over a thousand feet away.

85.    Taken as a whole, the Memorial is a solemn and moving homage to this nation's greatest president, to the millions of soldiers who died to preserve the Union during the Civil War, and to the emancipation of Black Americans from slavery.

86.    Many descriptors might be applied to a UFC weigh-in. "Solemn" and "moving" are not among them.

87.    Instead, because each fighter faces off with his opponent just after weighing in, the events tend to be raucous, profane, and sometimes violent affairs.

88.    For instance, just a few weeks ago, at the UFC 328 weigh in, Sean Strickland called his opponent Khamzat Chimaev a "son of a whore" and a "bitch."

89.    At UFC 229, Conor McGregor lunged and then threw a kick at his opponent, Khabib Nurmagomedov. McGregor later referred to Nurmagomedov as a "mad backwards c---" and taunted Nurmagomedov's Muslim faith by offering him whiskey.

90.    And at UFC 178, after Daniel Cormier shoved Jon Jones prior to their light heavyweight title fight, a brawl broke out and spilled into the crowd.

91.     The UFC has announced that it will be holding the UFC Freedom 250 ceremonial weigh-ins and face-offs on the evening of June 13 at the Lincoln Memorial.

92.     On information and belief, Defendants have authorized or otherwise allowed the UFC to use sound equipment as part of the UFC Freedom 250 ceremonial weigh-ins.

93.     On information and belief, the UFC intends to use such sound amplification equipment at a level that will be audible at the Vietnam Veterans Memorial.

**VIII.   Reporting published on June 4, 2026 reveals that the UFC Freedom 250 event is not being planned, organized, and executed by any executive agency, department, or the Semiquincentennial Commission.**

94.     No executive department or agency is playing a significant role in the planning, organizing, and executing of UFC Freedom 250.

95.     The UFC selected, hired, and, announced the fighters; designed and is supervising installation of the physical facilities; and will in every material sense execute the festivities on the nights of June 13 and 14.

96.     The only arguable exception will be security, which the Secret Service is coordinating for all semiquincentennial events. But neither the Secret Service nor any other agency or department is responsible for the substance of the event.

97.     Most damningly, reporting published on June 4, 2026, has established that no official semiquincentennial commission is planning, organizing, and executing the event, either.

98.     There are currently two entities competing for the role of America's official semiquincentennial commission.

99.     The first, and the one with by far the stronger claim, is the congressionally authorized commission known colloquially as "America 250." This is the commission identified by name in the America250 temporary rule.

16

100. The second is a public-private partnership created pursuant to executive order, known as "Freedom 250."

101. Freedom 250 is not an official commission; it is instead a "wholly owned subsidiary" of the National Park Foundation, the National Park Service's official, congressionally chartered charity.

102. Previously, Freedom 250 was understood to be the organizing entity responsible for UFC Freedom 250. For instance, reporting published by USA Today on June 2, 2026, suggested as much.

103. But reporting published by MS Now on June 4, 2026, revealed otherwise. A Freedom 250 spokesperson quoted in that reporting "said the White House fight, billed as 'UFC Freedom 250,' is not affiliated with the organization and shares only its branding."

104. In other words, not even the more legally dubious of the two semiquincentennial commissions is responsible for planning, organizing, or executing UFC Freedom 250. The event is, in formal terms, a private undertaking.

## IX.    The UFC Freedom 250 event is being planned, organized, and executed with all the hallmarks of a private, for-profit sporting event.

105. In substance as well as formally, UFC Freedom 250 is being planned and operated as a private, profit-motivated sports promotion.

106. The event is privately financed. Reports have estimated the cost of the event to be around $60 million. But the UFC has denied that any taxpayer dollars are being spent to front those costs. White, in particular, has claimed that the UFC is "eating the whole thing," and that he is "spending a shitload of money."

107. Despite White's claims to the contrary, the event will likely be profitable for UFC and its partners. White has estimated that the UFC will lose "$30 million" on the event. But recent

reporting indicates that the event capacity will be over 4,000, and that the UFC will control up to a third of the seats. (Another third will be allocated to White House personnel and families. The remaining third of seats will be available to servicemembers—for free, but only so long as they have a "waist-to-height ratio under 0.55" and satisfy various other "fitness test" requirements.)

108.    The UFC has denied that it is selling any of its share of 1,300 seats. But recent reporting indicates that the UFC is offering "sponsorship packages" priced at between $1 and $1.5 million per head. "Sponsors" reportedly will receive access to the White House event—*i.e.*, a seat—VIP access to weigh ins and press conferences, admission to a pre-fight concert by the Zac Brown Band, and may also receive access to parts of the White House complex of buildings. Sponsorship packages notably have *not* been reported to include any conventional sponsorship benefits, such as advertising or promotional opportunities. The packages thus appear to be dressed up (and extraordinarily expensive) tickets.

109.    If the event's reported $60 million cost is accurate, the UFC would need to sell just 40 of its $1.5 million "sponsorship packages" to break even—without even accounting for its many other sources of revenue, such as advertising or broadcaster incentives.

110.    Beyond direct profits, the UFC is openly boasting about the enormous long-term commercial benefits it will realize from hosting an event at two of the Nation's most iconic monuments. Mark Shapiro, the President of UFC's parent company, TKO, recently remarked: "This is the greatest earned-marketing tool of all time. It's a once-in-a-generation moment. The kind of attention, awareness, and sampling we're going to get from audiences around the world, on that day alone, will be more than we could get in an entire year."

111.    The UFC's principal American broadcast partner also stands to benefit. The UFC recently sold seven years of its broadcast rights to Paramount Skydance Corp., CBS's parent

company, for $7.7 billion. UFC cards typically feature both a preliminary card, with up-and-coming fighters, and a main card, with more established fighters competing to move up the rankings or, at major events, for a championship belt. The preliminary and main cards are often broadcast on different platforms. In the case of UFC Freedom 250, reporting indicates that some preliminary fights will be broadcast to the general public on CBS. But the much more high-profile main card, featuring two championship fights, will be available only on Paramount's subscription streaming platform, Paramount Plus.

112.    Paramount Plus subscriptions start at $8.99 per month. UFC Freedom 250 thus provides Paramount with a banner opportunity to begin recouping some of its extraordinary outlay for UFC broadcast rights.

113.    Advertisers, too, stand to benefit.

114.    UFC events typically feature prominent advertiser branding on the Octagon floor and side padding. The cage at UFC's May 9, 2026 event in Newark, New Jersey, was typical. It featured advertising for Monster (an energy drink), Polymarket (a prediction market), Stake (a gambling platform), Aviator (a video game), and at least five separate alcohol brands, among other brands:



*The Octagon floor at UFC 328*

115.    Similar advertisements run at weigh ins. At the "UFC Vegas 118" weigh-in in June, 2026, advertisements for Paramount, Meta, and MMA Junkie prominently appeared behind the fighters.



*Weigh-in advertisements at UFC Vegas 118*

116.    At UFC Freedom 250, the UFC's advertisers will have the opportunity to have such advertising prominently displayed in immediate proximity to the White House. These advertisers will similarly have the chance to promote themselves at the weigh-in at the Lincoln Memorial.

117.    In particular, one of UFC Freedom 250's lead branding partners is Crypto.com, the Singaporean cryptocurrency exchange. Crypto.com has announced that it will be providing the cryptocurrency equivalent of $1 million in performance bonuses to fighters. And Crypto.com's logo has been splashed across materials promoting the event—materials that are not subtle about exploiting the White House imagery for commercial purposes:



*Crypto.com promotional materials for UFC Freedom 250*

118.    In sum, the UFC, its parent company TKO, its broadcast partner Paramount, and its advertisers are all treating UFC Freedom 250 like they would any other UFC event: as a business opportunity—or as the President of TKO, put it, as "the greatest earned-marketing tool of all time."

119.     The hallmarks of a for-profit sporting spectacle pervade the event: VIP access offered at premium prices, broadcast on a subscription-only commercial streaming platform, a private corporate promoter, private financing of the buildout, and private receipt of the proceeds.

120.     Trump will also profit from a successful UFC Freedom 250: according to reporting published in late May, he purchased up to $50,000 worth of TKO stock earlier this spring.

X.     **By authorizing UFC Freedom 250's use of the South Lawn and Lincoln Memorial, the associated access restrictions and closures, and the erection of the Claw—all without congressional authorization or environmental review—Defendants have injured plaintiffs.**

121.     Defendants have authorized UFC Freedom 250 pursuant to the America250 Exemption. That authorization encompasses the event's use of the South Lawn and Lincoln Memorial; the ongoing associated construction, including the Claw; and the resulting park and road closures and access restrictions.

122.     As set forth above and below, such authorization is unlawful in several respects.

123.     Through their unlawful authorization decisions, Defendants have injured and are injuring Plaintiffs.

   A.     **Plaintiff Susan Douglas**

124.     Defendants' actions have inflicted and continue to inflict aesthetic, physical, expressive, and procedural injuries on Plaintiff Douglas.

125.     Douglas moved to Washington, DC in 1969, attended high school in the District and college at American University. She worked for several years in the intelligence community, and lived in Germany for a time in connection with that work, but has otherwise lived exclusively in the Washington, DC area for over 50 years. She currently lives in Alexandria, Virginia, and is retired.

22

126.    Over her decades of residency in the DC region, Douglas has very frequently visited President's Park and the Lincoln Memorial. She cherishes those spaces for their aesthetic beauty and powerful symbolism of the American ideal of, in President Lincoln's words, "government of, by, and for the people."

127.    In her retirement, Douglas has devoted herself to activism and organizing, including in particular activism and organizing aimed at preserving the physical beauty and cultural sanctity of the national capital and its monuments. As part of her organizing and activism work, Douglas has helped to plan and organize, and has participated in, a number of recent protests and other actions near the White House and Lincoln Memorial.

128.    On October 24, 2025, Douglas protested the illegal destruction of the East Wing outside the White House. On February 11, 2026, Douglas attended the Walk for Peace at and around the Lincoln Memorial, and served for five hours as a volunteer safety marshal. On March 22, as part of planning for the No Kings 3 protest, Douglas helped to scout a protest march route from Memorial Bridge to the Lincoln Memorial, on to Constitution Gardens, and then passing by the White House to access the DC Metro. On March 28, Douglas joined 8,000 others in marching that route for the No Kings 3 protest, which included stopping at the Lincoln Memorial and taking pictures in front of its iconic façade. On April 7, Douglas protested the illegal war in Iran outside the White House. On May 1, Douglas attended the May Day Free DC protest at the Washington Monument, and marched holding a large canvas replica of the U.S. Constitution. On May 21, Douglas testified against the Memorial Bridge Triumphal Arch at a Commission on Fine Arts Meeting. From May 24 to 26, Douglas participated in a three-day vigil at the Watergate Steps, across from the Lincoln Memorial, to protest the Arch.

129. Douglas also visited other parts of downtown DC, including the National Mall, Capitol, and Supreme Court areas, for protests or other activist work on April 1, April 24, May 20, June 2, and June 4.

130. All in all, Douglas has visited the White House and National Mall areas at least one time per week since this spring, before construction for UFC Freedom 250 began.

131. Douglas has firm, concrete plans to visit President's Park and the Lincoln Memorial in coming weeks. On June 8, Douglas will attend the Moral Monday protest adjacent to the White House. On June 9, Douglas will be in the White House area to do scouting and preparation work for a protest planned for June 14. On the evening of June 13, Douglas will walk across the Memorial Bridge to the Lincoln Memorial to protest President Trump, his disfigurement of the National Mall, and the UFC Freedom 250 weigh-ins. And on June 14, President Trump's birthday, Douglas will attend an anti-Trump protest she is currently planning and organizing. She has been engaged in planning that protest for two weeks.

132. During her recent past visits to the White House and National Mall, Douglas has observed the construction connected with UFC Freedom 250, including in particular the so-called "Claw" currently being erected on the South Lawn. She expects to observe the same structures during her planned future visits on at least June 8, 9, 13, and 14.

133. For Douglas, the erection of those structures, particularly the Claw, is disfiguring the iconic memorial landscape of downtown Washington, DC. Douglas has observed that the Claw dwarfs the adjacent White House and is visible from the National Mall. Douglas finds the Claw aesthetically hideous, and its erection next to the White House grotesque, particularly when juxtaposed with the now-ruined East Wing.

134.    The erection of the Claw and other structures for UFC Freedom 250 is causing and will continue to cause Douglas aesthetic injury by diminishing the personal enjoyment, experience of beauty, and feelings of national pride she previously experienced when observing the White House. Douglas similarly anticipates that the erection of structures for the weigh-ins at the Lincoln Memorial will cause her aesthetic injury when she visits that Memorial on the evening of June 13.

135.    Douglas travels to and around downtown Washington by Metro and on foot.

136.    Douglas is nearly 70 years old, and has painful osteoarthritis in both knees. Last year, she underwent 6 months of physical therapy for her knees, and received injections of Orthovisc to replace lost cartilage. Her medical providers have informed her that she should expect to have one or both knees replaced in coming years.

137.    The UFC Freedom 250-related closures and access restrictions described above have injured and will continue to injure Douglas by causing her to suffer physical pain. Those access restrictions make it difficult to anticipate how best to navigate the National Mall and President's Park on any given day, and have caused her to have to take circuitous routes different from those she had planned to reach her destination. She is committed to continuing her activist and organizing work, notwithstanding the pain walking causes her, and the closures and access restrictions will substantially magnify the pain she suffers.

138.    The closures and access restrictions have also injured and will continue to injure Douglas by burdening her activism and organizing work and free expression. In particular, as part of the protests she organizes, she and other activists routinely employ props—for instance, the canvass replica of the Constitution used for the May Day protest. For the June 14 protest, she and other activists intend to display caricature-style papier mâché figures of President Trump, Defense Secretary Hegseth, and other administration figures inside a bamboo "cage." Alongside that

display, they plan to erect a sign reading "The only cage we need." Such props help them to send a more powerful, effective symbolic message by attracting significant public and media attention. For instance, their props were photographed and published by several news outlets after the No Kings 3 protest.

139. The UFC Freedom 250 closures and access restrictions are making it far more difficult to plan for and execute transportation of large props on foot. Those props are heavy and are already difficult to move because of Douglas's osteoarthritis. The access restrictions have significantly increased the difficulty, burdening her ability to organize and engage in First Amendment-protected expression.

140. Douglas has personally participated in opportunities to comment publicly on projects that affect the physical and cultural landscape of downtown Washington. For instance, on June 4, she testified at a hearing on the planned Triumphal Arch at the National Capital Planning Commission.

141. Had there been an opportunity to testify or otherwise provide public comment in opposition to UFC Freedom 250, including in particular its disfigurement of the White House façade and destruction of the White House South Lawn, Douglas would have done so.

142. Defendants' failure to provide an opportunity for Douglas and other members of the public to provide such public comment has inflicted a procedural injury on Douglas.

**B.      Plaintiff Paul Romano**

143. Defendants' actions have inflicted and continue to inflict dignitary, aesthetic, and procedural injuries on Plaintiff Romano.

144. Romano is a Vietnam War veteran, and served in the United States Air Force from 1969 through 1973 as a medevac crew member. He retired as a Sergeant.

145. After leaving the military, Romano attended college, worked in private industry, and served as a police officer for the Department of Defense. As part of that latter work, from 2011 to 2012, he was assigned to drive civilian, military, and intelligence personnel throughout Afghanistan. He is now largely retired, volunteers, and drives for a ride-sharing company.

146. Romano's family moved to Arlington, Virginia in 1961. Since then, with the exception of military service in Vietnam and Afghanistan, he has lived in the Washington, DC area. He has been active in his community, and previously ran for the Fairfax County Board of Supervisors. He ran as a Republican.

147. In his current work as a ride-share driver, and to visit family, Romano drives along the National Mall and past the Lincoln Memorial several times a week. He believes that the monuments there, including the Vietnam Veterans Memorial and the Lincoln Memorial, are sacred spaces.

148. In particular, the Vietnam Veterans Memorial honors several men Romano knew personally, grew up with, and went to school with, who were killed in that war. He has visited the Memorial twice, and has found both visits to be enormously difficult emotionally.

149. Romano considers the Vietnam Veterans Memorial's quiet tranquility to be among its most moving and powerful features. That tranquility both honors the fallen and allows those who have come to pay their respects an opportunity to reflect and remember without interruption.

150. Romano understands that the UFC Freedom 250 weigh-ins are likely to be loud, due both to their nature and the likely use of sound amplification equipment. The weigh-ins are therefore likely to disturb the tranquility of the Vietnam Veterans Memorial, which is located not far away in the same monumental complex.

151. Romano considers such disturbance of the Vietnam Veterans Memorial's otherwise-permanent and legally mandated tranquility to be a grave desecration.

152. Defendants, by authorizing UFC Freedom 250 to use the Lincoln Memorial for purposes that will disturb the Monument's tranquility, have accordingly inflicted a dignitary injury on Romano.

153. Romano also cherishes the Lincoln Memorial itself as a moving and powerful tribute to the servicemembers who fell in the Civil War.

154. In part because of his appreciation for the Lincoln Memorial, Romano has spoken out against and protested the planned Memorial Bridge Triumphal Arch, which in Romano's view will interrupt and deface the physical landscape currently defined by the Lincoln Memorial on one end and Arlington National Cemetery on the other. On June 4, Romano testified at the National Capital Planning Commission in opposition to the Arch.

155. Romano considers the Lincoln Memorial's use for a private, for-profit sporting event to be both an aesthetic travesty and an offense to his dignity, that of other service members, and the monument itself.

156. As part of his work as a driver, Romano has driven by the "Claw" structure under construction on the White House lawn ten to fifteen times.

157. Romano finds the Claw aesthetically and symbolically disgusting. Its presence on the South Lawn ruins what is otherwise one of the most enjoyable parts of his work as a driver: the opportunity to appreciate the aesthetic beauty and coherence of President's Park, the White House, and the monuments on the National Mall as he drives by them.

158. Defendants, by authorizing UFC Freedom 250 and the Claw, have accordingly inflicted aesthetic injury on Romano.

159.    Romano has not been afforded an opportunity to testify about UFC Freedom 250, the Claw and associated construction, or the weigh-in at the Lincoln Memorial. Romano would have testified given the opportunity.

160.    Defendants' failure to provide an opportunity for Romano and other members of the public to provide such testimony or public comment has inflicted a procedural injury on Romano.

## COUNT I
## VIOLATION OF NPS REGULATIONS
*Capital Region Regulation, 36 C.F.R. § 7.96; Administrative Procedure Act, 5 U.S.C. § 706*

161.    Plaintiffs incorporate all allegations set forth above and below as though set forth in this paragraph.

162.    The National Park Service and the Department of the Interior are "agenc[ies]" within the meaning of 5 U.S.C. § 551(1).

163.    Defendants' decisions authorizing UFC Freedom 250's fights to occur on the South Lawn and the weigh in to occur at the Lincoln Memorial, and authorizing the associated construction of event facilities, including in particular the Claw, are final agency actions subject to judicial review under 5 U.S.C. §§ 702, 704, and 706.

164.    Under the Capital Region Regulation, special events, including specifically any and all athletic events, may be held in President's Park or the Lincoln Memorial only pursuant to a valid permit issued by the Regional Director. 36 C.F.R. § 7.96(g)(2).

165.    The UFC Freedom 250 event at the White House and the Lincoln Memorial weigh-in do not satisfy the Capital Region Regulation's usual criteria for a special event permit to issue. Among other issues, the Regulation authorizes special sporting events only on the Ellipse, not the South Lawn, and does not authorize special sporting events at the Lincoln Memorial under any circumstances.

29

166.    Accordingly, Defendants' authorization decisions necessarily rested on the America250 Exemption set forth in 36 C.F.R. § 7.96(g)(8).

167.    That Exemption extends only to "special events planned, organized, and executed by executive departments and agencies or the Semiquincentennial Commission for the celebration of the 250th anniversary of American Independence."

168.    The UFC Freedom 250 event is not being "planned, organized, and executed by executive departments and agencies or the Semiquincentennial Commission."

169.    Rather, both formally and in all practical terms, UFC Freedom 250 is a private, for-profit fight promotion planned, organized, and executed by a private company. As set forth above, the UFC, its broadcast partner, and its advertisers are planning, organizing, and executing all material aspects of the event except security.

170.    The UFC Freedom 250 event also is not being held "for the celebration of the 250th anniversary of American Independence." Rather, UFC Freedom 250 is being held for the financial benefit of the UFC, Paramount, and their advertisers, and to celebrate the 80th anniversary of Donald Trump's birth.

171.    Accordingly, Defendants' determination that UFC Freedom 250 qualifies for the America250 Exemption was arbitrary, capricious, an abuse of discretion, and in excess of authority, because it disregarded the event's plainly commercial and private character and the regulation's plain text.

172.    Absent the Exemption, the categorical prohibitions of 36 C.F.R. § 7.96(g)(3) and the limits of § 7.96(g)(5) both apply, meaning that no permit may lawfully issue to hold a sporting event on either the South Lawn or at the Lincoln Memorial.

173. Defendants' action nonetheless authorizing the event was therefore "arbitrary, capricious, an abuse of discretion," "not in accordance with law," and "in excess of statutory jurisdiction, authority, or limitations," within the meaning of 5 U.S.C. § 706(2)(A) and (C).

174. Defendants' unlawful action has injured and will injure Plaintiffs as set forth above.

175. Plaintiffs are entitled to an order holding unlawful and setting aside Defendants' illegal permitting decision.

## COUNT II
## ERECTING OF STRUCTURES ON FEDERAL PARKLAND WITHOUT CONGRESSIONAL AUTHORIZATION
*Park Service Organic Act, 40 U.S.C. § 8106; Administrative Procedure Act, 5 U.S.C. § 706*

176. Plaintiffs incorporate all allegations set forth above and below as though set forth in this paragraph.

177. The National Park Service and the Department of the Interior are "agenc[ies]" within the meaning of 5 U.S.C. § 551(1).

178. Defendants' decisions authorizing the construction of UFC Freedom 250 event facilities, including in particular the Claw, are final agency actions subject to judicial review under 5 U.S.C. §§ 702, 704, and 706.

179. Under 40 U.S.C. § 8106, a provision of the Park Service's Organic Act, no structure may be erected on the public grounds of the District of Columbia under the charge of the National Park Service except as expressly authorized by Congress.

180. The Claw is a structure.

181. The Claw has been erected on the South Lawn of the White House.

182. Congress has not authorized erection of the Claw on the South Lawn of the White House.

31

183.    Congress has not authorized permanent installation of the Claw on the South Lawn, as Trump has indicated may be his intention.

184.    By authorizing the erection of the Claw without congressional authorization, Defendants acted contrary to 40 U.S.C. § 8106, and therefore "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations," within the meaning of 5 U.S.C. § 706(2)(A) and (C).

185.    Defendants' unlawful action has injured and will injure Plaintiffs as set forth above.

186.    Plaintiffs are entitled to an order holding unlawful and setting aside NPS's authorization, and enjoining the erection of the structures and the staging of the event.

**COUNT III**
**(ALTERNATIVE COUNT)**
**FAILURE TO CONDUCT ENVIRONMENTAL REVIEW**
*National Environmental Policy Act, 42 U.S.C. § 4332;*
*Administrative Procedure Act, 5 U.S.C. § 706*

187.    Plaintiffs incorporate all allegations set forth above and below as though set forth in this paragraph.

188.    Plaintiffs plead this Count in the alternative to Count I, above.

189.    The National Park Service and the Department of the Interior are "agenc[ies]" within the meaning of 5 U.S.C. § 551(1).

190.    Defendants' permitting decision authorizing the construction of UFC Freedom 250 event facilities, including in particular the Claw, is a final agency action subject to judicial review under 5 U.S.C. §§ 702, 704, and 706.

191.    The National Environmental Policy Act requires a federal agency to prepare an environmental impact statement, or at least an environmental assessment, before undertaking a "major federal action" significantly affecting the quality of the human environment, unless a valid categorical exclusion applies. 42 U.S.C. § 4332.

192.    Plaintiffs' lead claim, *supra* Count I, is that UFC Freedom 250 does not constitute a federal action because it is a private, profit-motivated endeavor.

193.    But alternatively, insofar as UFC Freedom 250 is deemed a public-private partnership that may be authorized under the America250 Exemption, the event likewise constitutes a major federal action subject to NEPA.

194.    The America250 rule did not waive NEPA. To the contrary, it committed each permit issued under 36 C.F.R. § 7.96(g)(8) to "the appropriate NEPA process at that time."

195.    On information and belief, Defendants authorized the event without an environmental assessment or environmental impact statement.

196.    By authorizing the event in the absence of the environmental review NEPA requires, Defendants acted "without observance of procedure required by law" and "not in accordance with law," within the meaning of 5 U.S.C. § 706(2)(D) and (A).

197.    Defendants' unlawful action has injured and will injure Plaintiffs as set forth above.

198.    Plaintiffs are entitled to an order holding unlawful and setting aside Defendants' authorization pending compliance with NEPA.

## COUNT IV
## *ULTRA VIRES* AGENCY ACTION
*Non-Statutory*

199.    Plaintiffs incorporate all allegations set forth above and below as though set forth in this paragraph.

200.    Plaintiffs have a non-statutory cause of action to set aside and enjoin agency action that is *ultra vires* and in excess of delegated powers.

201.    No constitutional provision, statute, regulation, or other source of law allows Defendants to authorize private sporting events on the White House South Lawn or at the Lincoln Memorial.

33

202.    Such authorization was therefore *ultra vires* and, insofar as it is not subject to challenge under the Administrative Procedure Act, can and should nevertheless be enjoined.

## COUNT V
## DECLARATORY JUDGMENT
*Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–02*

203.    Plaintiffs incorporate all allegations set forth above and below as though set forth in this paragraph.

204.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, this Court may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

205.    An actual and justiciable controversy exists between Plaintiffs and Defendants concerning the lawfulness of Defendants' authorization of UFC Freedom 250 and the construction of its facilities on the South Lawn.

206.    Plaintiffs are entitled to a judgment declaring that Defendants' conduct is unlawful, in excess of statutory authority, and undertaken without the environmental review the law requires.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

A.    Declare unlawful and *ultra vires* Defendants' decisions authorizing the organizers of UFC Freedom 250 to utilize the South Lawn and Lincoln Memorial for a sporting event, and to erect structures on the South Lawn;

B.    Vacate and set aside Defendants' decision as arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A); not in accordance with law under 5 U.S.C. § 706(2)(A); in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C); without observance of procedure required by law under 5 U.S.C. § 706(2)(D); and *ultra vires*;

34

C.      Stay the effect of Defendants' decisions during the pendency of this lawsuit under 5 U.S.C. § 705;

D.      Temporarily restrain, preliminarily enjoin, and permanently enjoin Defendants from permitting the organizers of UFC Freedom 250 to utilize the South Lawn and Lincoln Memorial for a sporting event, and from permitting the organizers of UFC Freedom 250 to erect structures, including the so-called "Claw," on the South Lawn;

E.      Award Plaintiffs their costs and reasonable attorneys' fees; and

F.      Grant such other and further relief as the Court deems just and proper.


Dated: June 6, 2026                          Respectfully submitted,

                                             /s/ Samuel T. Ward-Packard

                                             **PUBLIC INTEGRITY PROJECT**
                                             Brendan Ballou
                                             D.C. Bar No. 241592
                                             Samuel T. Ward-Packard
                                             D.C. Bar No. 90005484
                                             ballou@publicintegrityproject.org
                                             sam@publicintegrityproject.org

                                             *Attorneys for Plaintiffs*


35