UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SUSAN DOUGLAS, *et al.*,

        Plaintiffs,

    v.

NATIONAL PARK SERVICE, *et al.*,

        Defendants.

Case No. 1:26-cv-02016-APM

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' EMERGENCY
APPLICATION FOR A TEMPORARY RESTRAINING ORDER**

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................................... 1

BACKGROUND ......................................................................................................................... 3

    I.    The White House and President's Park ............................................................... 3

    II.    The Lincoln Memorial ....................................................................................... 7

    III.   UFC Freedom 250 ............................................................................................. 8

LEGAL STANDARD ............................................................................................................... 14

ARGUMENT ............................................................................................................................ 14

    I.    The Court Should Deny an Injunction Based on the Equitable Factors Alone. ................ 14

        A.    Plaintiffs Sat on Their Hands and Cannot Establish Irreparable Harm. ............... 14

        B.    The Balance of Equities Weighs Heavily Against Relief. ................................... 17

    II.    Plaintiffs Have No Likelihood of Success on the Merits. ................................................. 18

        A.    Plaintiffs Lack Article III Standing. ........................................................................ 19

        B.    Plaintiffs Failed to Join the UFC as a Required Party ........................................... 23

        C.    Plaintiffs' NPS Regulatory Claim Fails on the Merits. .......................................... 24

        D.    Plaintiffs' Section 8106 Claim Fails on the Merits. ............................................... 26

        E.    Plaintiffs' NEPA Claim Fails on the Merits. ......................................................... 28

    III.   Although the Court Should Not Grant Relief, Any Relief Should Be Narrow, ..................
Supported by a Bond, and Stayed Pending Appeal........................................................... 30

CONCLUSION.......................................................................................................................... 32

**TABLE OF AUTHORITIES**

**Cases**

*A.N.S.W.E.R. Coal. (Act Now to Stop War & End Racism) v. Basham*,
845 F.3d 1199 (D.C. Cir. 2017) ................................................................................. 7

*Ali v. Carnegie Inst. of Wash.*,
306 F.R.D. 20 (D.D.C. 2014), *aff'd* 684 F. App'x 985 (Fed. Cir. 2017) ............................. 24, 31

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
480 U.S. 531 (1987) .................................................................................................. 16

*Animal Legal Def. Fund v. Vilsack*,
640 F. Supp. 3d 134 (D.D.C. 2022) ........................................................................... 22

*Ateba v. Leavitt*,
133 F.4th 114 (D.C. Cir. 2025) .................................................................................... 7

*Benisek v. Lamone*,
585 U.S. 155 (2018) ............................................................................................. 14, 16

*Boat Basin Inv'rs, LLC v. First Am. Stock Transfer, Inc.*,
No. 03 Civ. 493, 2003 WL 282144 (S.D.N.Y. Feb. 7, 2003) ....................................... 24

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*,
996 F.3d 37 (1st Cir. 2021) ........................................................................................ 15

*Califano v. Yamasaki*,
442 U.S. 682 (1979) .................................................................................................. 31

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) .................................................................................... 28

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .................................................................................................. 22

*Ctr. for Biological Diversity v. United States Env't Prot. Agency*,
937 F.3d 533 (5th Cir. 2019) ..................................................................................... 20

*Dep't of State v. AIDS Vaccine Advocacy Coal.*,
145 S. Ct. 753 (2025) ................................................................................................ 23

*Diamond v. Charles*,
476 U.S. 54 (1986) .................................................................................................... 22

*Envt'l Def. Fund v. FERC,*
2 F.4th 953 (D.C. Cir. 2021) ................................................................ 19, 20

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) ............................................................................. 19, 21

*Fed. Express Corp. v. U.S. Dep't of Com.,*
39 F.4th 756 (D.C. Cir. 2022) ................................................................... 27

*Fund for Animals v. Frizzell,*
530 F.2d 982 (D.C. Cir. 1975) ................................................................... 15

*Global Health Council v. Trump,*
153 F.4th 1 (D.C. Cir. 2025) ...................................................................... 28

*Griffith v. FLRA,*
842 F.2d 487 (D.C. Cir. 1988) .............................................................. 26, 27

*Grundmann v. Trump,*
786 F. Supp. 3d 188 (D.D.C. 2025) ........................................................... 15

*Hanson v. D.C.,*
120 F.4th 223 (D.C. Cir. 2024) .................................................................. 16

*Holmberg v. Armbrecht,*
327 U.S. 392 (1946) ................................................................................... 16

*Kennedy v. Braidwood Mgmt., Inc.,*
606 U.S. 748 (2025) ................................................................................... 27

*Kim v. Fin. Indus. Regul. Auth., Inc.,*
698 F. Supp. 3d 147 (D.D.C. 2023) ........................................................... 14

*Laufer v. Alamac Inc.,*
621 F. Supp. 3d 1 (D.D.C. 2021) ............................................................... 22

*Lee v. Christian Coal. of Am., Inc.,*
160 F. Supp. 2d 14 (D.D.C. 2001) ............................................................. 15

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ................................................................................... 19

*Max-Planck-Gesellschaft Zur F%20orderung Der Wissenschaften E.V. v. Whitehead Inst. for
Biomedical Rsch.,*
650 F. Supp. 2d 114 (D. Mass. 2009) ........................................................ 15

*Munaf v. Geren*,
   553 U.S. 674 (2008).................................................................................................. 14

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
   763 F. Supp. 3d 13 (D.D.C. 2025) ............................................................................ 30

*Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*,
   468 F.3d 826 (D.C. Cir. 2006)............................................................................ 20, 22

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
   606 U.S. —, 145 S. Ct. 2658 (2025)......................................................................... 31

*Nat'l Parks Conservation Ass'n v. Semonite*,
   282 F. Supp. 3d 284 (D.D.C. 2017) .......................................................................... 23

*Nat'l Tr. for Historic Pres. in the U.S. v. Nat'l Park Serv.*,
   821 F. Supp. 3d 62 (D.D.C. 2026) ............................................................................ 26

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.,*
   ---F. Supp. 3d---, 2026 WL 877779 (D.D.C. Mar. 31, 2026)..................................... 16

*Newdow v. Bush*,
   355 F. Supp. 2d 265 (D.D.C. 2005) .................................................................... 17, 20

*Nken v. Holder*,
   556 U.S. 418 (2009)........................................................................................... 14, 32

*Nuclear Regul. Comm'n v. Texas*,
   605 U.S. 665 (2025)................................................................................................... 27

*Nyunt v. Chairman, Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009).............................................................................. 26, 27

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
   48 F. Supp. 3d 87 (D.D.C. 2014) .............................................................................. 15

*People v. Norcutt*,
   115 A.D.3d 1306 (2014) ............................................................................................ 27

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
   605 U.S. 168 (2025)................................................................................................... 30

*Singh v. Berger*,
   56 F.4th 88 (D.C. Cir. 2022) ..................................................................................... 30

*State v. Sjogren*,
   313 Or. App. 364, 494 P.3d 1040 (2021) .................................................................. 27

iv

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ........................................................................................................ 22

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ...................................................................................................... 23

*Sunset Homeowners Ass'n, Inc. v. DiFrancesco*,
    386 F. Supp. 3d 299 (W.D.N.Y. 2019) ........................................................................ 24

*Sweetland v. Walters*,
    60 F.3d 852 (D.C. Cir. 1995) ........................................................................................ 26

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ...................................................................................................... 31

*Tulare Cnty v. Bush*,
    185 F. Supp. 2d 18 (D.D.C. 2001), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002) ............... 28

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
    933 F.3d 728 (D.C. Cir. 2019) ................................................................................... 29,

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) ...................................................................................................... 22

*Wash. All. of Tech. Workers v. U.S. DHS*,
    50 F.4th 164 (D.C. Cir. 2022) ...................................................................................... 28

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................................... 14, 17

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ...................................................................................... 16

**Statutes**

40 U.S.C. § 8106 ................................................................................................................ 2, 26

42 U.S.C. § 4336 ..................................................................................................................... 29

Pub. L. No. 87-286, 75 Stat. 586 (1961) ......................................................................... 3, 4, 23

**Rules**

Fed. R. Civ. P.  19 ............................................................................................................ 24, 25

Fed. R. Civ. P. 65 ..................................................................................................................... 31

**Regulations**

36 C.F.R. § 7.96 ................................................................................................................. *passim*

43 C.F.R. § 46.215 ..................................................................................................... 30

Executive Order 14189, 90 Fed. Reg. 8849 (Jan. 29, 2025) ................................. 8, 11, 12

**Other Authorities**

Alex Leary, Inside the Planning for a UFC Cage Match on the White House Lawn,
    Wall St. J. (Sept. 5, 2025), https://perma.cc/PSY7-PBR2 ..................................... 10

"Building," Black's Law Dictionary (12th ed. 2024) ................................................ 27

Damon Martin, President Trump reveals plans to hold a UFC event at the White House in
    2026, MMA Fighting (July 3, 2025), https://perma.cc/RA5L-MH43 ..................... 10

DOI NEPA Handbook, Appendix 2 ......................................................................... 29

Happy Punch (@HappyPunch), X (Aug. 28, 2025 10:19PM),
    https://perma.cc/L5DY-MM8Q................................................................................. 10

Joel D. Treese, Baseball and the White House in the Nineteenth Century, White House
    Historical Association (Feb. 26, 2015), https://perma.cc/JL3S-GFM4 ..................... 4

National Park Service, Explore the Lincoln Memorial Undercroft (Last Updated June 2, 2026),
    https://perma.cc/AG8P-53WC .................................................................................. 8

Nemanja Lakicevic et al., Effects of Rapid Weight Loss on Kidney Function in Combat Sports
    Athletes, 57 Medicina 551 (2021), https://perma.cc/83ZN-UAGV. ........................ 13

Shakiel Mahjouri, UFC CEO Dana White: Capacity will be limited for event at White House,
    but has plans for fans to attend nearby, CBS Reports (Sep. 11, 2025),
    https://perma.cc/EV4U-8H8D ................................................................................. 10

The Working White House: Tee Ball Game, White House Historical Association,
    https://perma.cc/9Z5G-Q4DW.................................................................................. 4

UFC, UFC to host fight for the troops event (Sept. 19, 2013),
    https://perma.cc/G2HH-BQ4K ................................................................................. 9

**INTRODUCTION**

This year's Fourth of July marks the 250th birthday of the United States of America.  To celebrate, the Government has spent over a year planning a series of special commemorative events worthy of the occasion, including fireworks shows, a state fair, an Indy car race on the National Mall, and much more.  One of the most highly anticipated events is a mixed-martial arts event scheduled to take place on the White House South Lawn this weekend, billed as "UFC Freedom 250."  This event is a collaboration between the White House, executive agencies, and the Ultimate Fighting Championship (UFC), and it has been in the making since President Trump first announced it last July.  In preparation, well over $60 million and tens of thousands of hours of labor have been expended.  More than 4,000 spectators are expected to attend on the South Lawn, including more than 1,000 members of our armed services, and more than 120,000 visitors are expected to watch from the nearby Ellipse after winning free tickets in a lottery.  Many of the event's attendees will visit from outside the capital region, and have already invested personal resources in lodging, air transportation, and other arrangements.  Fourteen world-class athletes, who have been training for months, have traveled from all over the world to compete (including for two world championships).

All these hopes could be dashed at the very last moment, however, by the whim of two people who believe they have superior taste and want to spoil the event for everyone else.  Plaintiffs Susan Douglas and Paul Romano are Virginia residents who think the sights and sounds associated with UFC Freedom 250 are "hideous" and "disgusting."  Decl. of Susan Douglas ¶ 8, ECF No. 3-2 (Douglas Decl.); Decl. of Paul Romano ¶ 18, ECF No. 3-3 (Romano Decl.).  It would be easy enough to simply avert their gazes for the weekend.  Instead, they seek to enlist the power of a federal court to impose their idiosyncratic preferences on the rest of the country and ruin an event designed to celebrate the United States of America.  And they have chosen to do so only *after*

Defendants and many third parties—the White House, the UFC, and ticketholders—have expended enormous time and vast resources for events starting in just days. A more starkly mismatched balance of harms would be difficult to conceive.

Plaintiffs' delay is inexcusable. These events were publicly announced almost a year ago; the dates were confirmed by the White House three months ago; and site preparations have been publicly visible for weeks. This alone suffices to deny emergency relief. Yet Plaintiffs' case for standing and irreparable harm only gets weaker from there. They allege aesthetic injuries, but the events at issue will occur over only a single weekend and last several hours in total. And it is not as though these events are taking place outside on Plaintiffs' doorstep. No, they actually aver that they intend to *seek out* that which offends their sensibilities, just so they can complain about it. This contradicts the fundamental standing principle that injuries cannot be self-inflicted. And as to the press conference scheduled at the Lincoln Memorial on Friday, Plaintiffs do not even claim they will be in the District of Columbia that day, let alone at the Lincoln Memorial. Particularly juxtaposed against the enormous cost and disruption that any injunction would cause, the balance of harms plainly forecloses relief. None of Plaintiffs' alleged harms entitles them to an early stoppage of this weekend's matches.

In all events, Plaintiffs cannot show any likelihood of success on their claims, let alone the strong showing that would be necessary for extraordinary emergency relief. They allege violations of National Park Service (NPS) regulations, the National Environmental Policy Act (NEPA), and a statutory prohibition on building in the District of Columbia without congressional authorization, codified at 40 U.S.C. § 8106. But NPS's regulations do not prohibit the UFC Freedom 250 activities. First, the NPS's regulations do not prohibit events on the White House South Lawn; rather they provide notice to the public that the NPS will not issue a special event permit or

2

demonstration permit within the White House grounds as defined in those regulations. Second, the activities occurring in the vicinity of the Lincoln Memorial are consistent with the NPS's regulations, under which the NPS regularly permits special events and demonstrations in the approach way to the Lincoln Memorial. As for NEPA, it applies only to *agency* actions, not the activities conducted by the White House on the South Lawn. For the NPS permitting actions authorizing activities occurring on parkland outside the White House grounds, NPS validly applied an existing NEPA categorical exclusion for actions, like those here, that do not have significant effects on the environment. No more searching review was required. Finally, as for Section 8106, that provision plainly does not apply to temporary fixtures like the staging that has been set up on the South Lawn, known as "the Claw." Indeed, Presidents from both parties have erected countless temporary fixtures on the South Lawn, for decades, without controversy.

In short, both the equities and the merits cut squarely against issuing injunctive relief. The Court should not invoke inapplicable procedural provisions to disrupt, at the last moment, an event that the White House, UFC, and the public have long been awaiting and preparing for. The Court should deny Plaintiffs' motion for injunctive relief.

## BACKGROUND

### I.   THE WHITE HOUSE AND PRESIDENT'S PARK

In 1961, Congress designated the White House and President's Park as a National Park to be administered pursuant to the NPS Organic Act. Pub. L. No. 87-286 (1961). In that legislation, Congress directed that "nothing done under [the Park's enabling legislation] shall conflict with the administration of the Executive offices of the President or with the use and occupancy of the buildings and grounds as the home of the President and his family and for his official purposes." *Id.* As a result, the Park is dually administered by both NPS and the White House, and NPS has

3

historically deferred to the White House's needs.  Decl. of John Stanwich, Nat'l Park Serv. Liaison to the White House ¶¶ 3-6 (Stanwich Decl.).

The White House South Lawn has a long history of hosting public events.  Perhaps the most famous is the annual Easter Egg Roll, which dates back to 1878 and is co-sponsored by NPS and the White House Historical Association; staff regularly erect temporary structures to facilitate security screening and entertainment for families at the event.  *Id*. ¶¶ 9-12. Other events that are not cosponsored by the NPS are also routinely held there.  State dinners that exceed the East Room's seating capacity are held under a large tent on the South Lawn; staff also erect supporting structures and utilities to provide heating, ventilation, and electricity.  *Id*. ¶¶ 18-20.  The annual Congressional Picnic takes place there, sometimes featuring a Ferris wheel.  *Id*. ¶¶ 21-22.  Other events include state arrival ceremonies, such as the reception of King Charles III; Halloween trick-or-treating; bill signing ceremonies; and swearing-in ceremonies for Supreme Court Justices.

Sports are no exception.  In 1865, President Andrew Johnson hosted professional baseball games on what is now the Ellipse.[1]  President George W. Bush began hosting an annual tee-ball game on the South Lawn, where White House "workers replicate[d] a major-league ball-park—complete with pitcher's mound, dug-out, and bleachers."[2]  Under President Biden, the White House erected a 48 foot by 68 foot ice-skating rink on the South Lawn, complete with a 100-ton air cooled refrigeration system and pump, lighting system, and sound system; NPS also erected a temporary structure that included public restrooms and skate rentals.  *Id*. ¶¶ 23-29.  The event was supported by the National Hockey League and Comcast.  *Id.* ¶¶ 27.

---

[1] Joel D. Treese, *Baseball and the White House in the Nineteenth Century*, White House Historical Association (Feb. 26, 2015), https://perma.cc/JL3S-GFM4.
[2] The Working White House: Tee Ball Game, White House Historical Association, https://perma.cc/9Z5G-Q4DW.





The White House has also erected substantial temporary structures when hosting concerts. For example, in 2022, Elton John performed on the South Lawn. The White House erected a large, covered stage for the event. *Id*. ¶¶ 30-32.

5





President Obama also regularly put on exhibitions at the White House in partnership with private entities, including the South by South Lawn event; the concert entitled BET Presents: Love and Happiness: An Obama Celebration; as well as a Beyonce concert.  Fisher Decl. ¶ 6.

NPS does not seek or issue special event permits for activities on White House grounds. The "demonstrations and special events" provision of NPS's regulations, 36 C.F.R. § 7.96(g),

6

exists to allow private parties to request to hold demonstrations or events on NPS land that constitutes a public forum.  *See A.N.S.W.E.R. Coal. (Act Now to Stop War & End Racism) v. Basham*, 845 F.3d 1199, 1208 (D.C. Cir. 2017) (describing the "Pennsylvania Avenue sidewalk … including Freedom Plaza," as "a quintessential public forum"). This provision provides notice to the public regarding where and under what circumstances the NPS permits events, and it also provides the framework under which NPS permits such events on a content- and viewpoint-neutral basis.  Regarding the White House and its grounds, that area is not considered a public forum, *see, e.g.*, *Ateba v. Leavitt*, 133 F.4th 114, 122 (D.C. Cir. 2025), as it is a secure facility.  Access to the South Lawn for the event on June 14 is being provided by the White House Office of Executive Residence (EXR), not permitted by NPS.  *See* Fisher Decl. ¶¶ 5, 9; Stanwich Decl. ¶ 43 (explaining NPS's role with respect to South Lawn activities that are not NPS events is "primarily facilitative"); *id*. ¶¶ 12, 18-37  (listing examples of events hosted by the President on the South Lawn for which NPS did not seek or issue permits).

## II.    THE LINCOLN MEMORIAL

The Lincoln Memorial is administered by NPS as part of the National Mall and Memorial Parks.  Like the White House, it too has been the site of countless celebrations and large festivities.

For example, Presidents George W. Bush, Obama, and Trump held inaugural opening ceremony events at the Lincoln Memorial in 2001, 2009, and 2017, respectively.  Decl. of Marisa Richardson, Chief of the Nat'l Mall & Mem'l Parks Div. of Permits Mgmt. ¶ 14 (Richardson Decl.).  On July 4, 2019, President Trump spoke at and hosted the Salute to America celebration, which included seven flyovers by military aircraft, including a B-2 Spirit and F-35 fighters, as well as musical performances and speeches. On May 11, 2024, the Aircraft Owners and Pilots Association hosted a National Celebration of General Aviation that featured a flyover by an unprecedented number of aircraft over the Lincoln Memorial.  Just this month, the renovation of

the Lincoln Memorial's undercroft was completed, and it has now been opened to the public as part of the nation's 250th birthday celebrations.[3]

Under NPS regulations, demonstrations and special events are not allowed in certain park areas, including "that portion of the [Lincoln Memorial] park area which is on the same level or above the base of the large marble columns surrounding the structure, and the single series of marble stairs immediately adjacent to and below that level." 36 C.F.R. 7.96(g)(3)(ii)(B); *see also* Richardson Decl. ¶¶ 5-6. However, special events *are* permitted under the regulation in the area between the Lincoln Memorial and the reflecting pool, which is outside the area of the Lincoln Memorial where the regulations prohibit demonstrations and special events. *See* 36 C.F.R. 7.96(g)(3)(ii)(B) & (E); Richardson Decl. ¶¶ 5-6.

### III.   UFC FREEDOM 250

*Overview*.  July 4, 2026, marks our country's 250th birthday, an occasion for all Americans to celebrate.  Plans have been made for a historic season of celebration following President Trump's Executive Order 14189, which created a federal task force (Taskforce 250) to "execute an extraordinary celebration of the 250th Anniversary of American Independence[.]" *Celebrating America's 250th Birthday*, Exec. Order No. 14,189 § 2(e), 90 Fed. Reg. 8849 (Jan. 29, 2025).  The celebration includes: projection of American history stories onto the Washington Monument; the Freedom 250 Grand Prix race; the Great American State Fair and the Great American Farmers Market to be hosted on the National Mall; the opening of the Lincoln Memorial Undercroft, the adjacent Desert Shield Desert Storm Memorial, and the Teddy Roosevelt Presidential Library in North Dakota; the Salute to America Fourth of July fireworks celebration; International Naval Review & Sail 4th events; a Times Square ball drop; Patriot Games competitions; Freedom Truck

---

[3] National Park Service, *Explore the Lincoln Memorial Undercroft* (Last Updated June 2, 2026), https://perma.cc/AG8P-53WC

Mobile Museums; Rededicate 250 national prayer event; special programming at Smithsonian museums and other Federal exhibition spaces; and myriad other events across the country, which overlap with hosting the FIFA World Cup this summer.

The White House is also hosting an event in partnership with the UFC on the South Lawn this weekend, as just one among many events celebrating our nation's birthday. The event, billed as UFC Freedom 250, will provide free entertainment to members of our Armed Services in attendance, as well as to countless spectators on the Ellipse. The UFC has a long history of hosting events to support members of the Armed Services in coordination with the government: "UFC Fight Night 7" (held December 13, 2006 at Marine Corps Air Station Miramar); "UFC: Fight for the Troops 1" (held December 10, 2008 in Fayetteville, NC); "UFC: Fight for the Troops 2" (held January 22, 2011 at Fort Hood near Killeen, TX); "UFC: Fight for the Troops 3" (November 6, 2025 held at Fort Campbell, Kentucky). *See* UFC, *UFC to host fight for the troops event* (Sept. 19, 2013), https://perma.cc/G2HH-BQ4K. The events have raised millions of dollars to help military veterans suffering from traumatic brain injuries and psychological health issues. *See id*. (reporting that first two events helped raise $14 million).

The schedule of events is as follows: a press conference at the Lincoln Memorial on Friday, June 12; a ceremonial weigh-in at the Ellipse on Saturday, June 13, to be followed by a concert headlined by the Zac Brown Band; and seven UFC matches will be held on the White House South Lawn on Sunday, June 14. *See* UFC Press Release (Apr. 15, 2026), https://perma.cc/BQ7V-UXAH. There will also be a corresponding UFC Freedom 250 Fan Fest taking place on the Ellipse both Saturday and Sunday, during which there will be interactive experiences, live shows featuring interviews with UFC athletes, celebrity appearances, and exclusive on-stage moments, plus meet-

9

and-greets, live music; all this builds toward a UFC Freedom 250 watch party on Sunday night. *See id*.

*Announcement and Planning.* President Trump first announced the idea of UFC Freedom 250 on July 3, 2025. Decl. of Jessica Bowron, Comptroller of the Nat'l Park Serv., Exercising the Delegated Auth. of the Dir. of the Nat'l Park Serv. ¶ 8 (Bowron Decl.). The President stated: "We're going to have a UFC fight on the grounds of the White House," and further explained that it would be "a part of [America] 250" celebrations.[4] On August 29, 2025, UFC CEO Dana White confirmed via social media that plans for the event had been finalized, stating, "We had the meeting at the White House... The White House fight is on."[5] On September 5, 2025, the Wall Street Journal reported that President Trump and the UFC's President Dana White had met and agreed to host UFC matches on the South Lawn of the White House in celebration of America's 250th.[6] On September 11, 2025, CBS Sports reported that up to 5,000 people would be in attendance on the South Lawn, and that there would be free, public viewing on the nearby Ellipse.[7]

In the eleven months since President Trump's announcement, more than seven federal government agencies and components have allocated significant resources and manpower in preparation for this event date: the Executive Office of the President, U.S. Secret Service, U.S. Park Police, Department of the Interior, National Park Service, Department of Homeland Security, and the Federal Aviation Administration. Decl. of Joshua Fisher, Dir. for White House Mgmt. &

---

[4] Damon Martin, President Trump reveals plans to hold a UFC event at the White House in 2026, MMA Fighting (July 3, 2025), https://perma.cc/RA5L-MH43.
[5] Happy Punch (@HappyPunch), X (Aug. 28, 2025 10:19PM), https://perma.cc/L5DY-MM8Q.
[6] Alex Leary, Inside the Planning for a UFC Cage Match on the White House Lawn, Wall St. J. (Sept. 5, 2025), https://perma.cc/PSY7-PBR2.
[7] Shakiel Mahjouri, UFC CEO Dana White: Capacity will be limited for event at White House, but has plans for fans to attend nearby, CBS Reports (Sep. 11, 2025), https://perma.cc/EV4U-8H8D.

Admin. ¶¶ 4, 9-13 (Fisher Decl.)  These preparations have required substantial intergovernmental coordination, alignment of resources, scheduling, and collaboration with external partners to ensure the safe access of more than 125,000 anticipated guests in the vicinity of the White House Complex.  *See id*. ¶ 9.  Significant costs have already been expended to secure the event area for the public.  UFC executives, White House staff, the Department of the Interior, the National Park Service, D.C. Government, and a range of law enforcement agencies coordinated by the Department of Homeland Security and U.S. Secret Service have collaborated to align the schedules of the President of the United States, the First Lady, UFC global executives, 14 unique UFC professional fighters based all over the world, the UFC fight calendar, and the White House events calendar.  *See id*. ¶¶ 4, 9-13.  Any delay would upend months of planning and risk jeopardizing the participation of key participants, including the President of the United States, UFC leadership, and the athletes themselves. The President plans immediate travel to France for the G7 conference at the conclusion of this event.  *Id*. at ¶ 16.

*Setting the Stage*. The UFC Freedom 250 build began over three weeks in advance.  The Secret Service has coordinated with UFC production to facilitate the security screening of an estimated 20 to 30 trucks of UFC equipment per day for installation onto the White House grounds beginning on May 20, 2026.  Fisher Decl. ¶ 10.  Building materials, technical equipment, catering, and event infrastructure deliveries were pre-scheduled months in advance to ensure timely delivery.  *Id.*  Supplies have been sourced from across the country.  Final preparations, including truck drivers actively en route to the Washington, D.C., area from around the country, are underway.  *Id.*

The UFC Freedom 250 build has required between 700 to 900 staff daily working onsite since May 20, 2026.  *Id*. ¶ 11.  Due to the high volume of subcontractors required to complete the

build in a timely and safe manner and the specialized knowledge required, the loss of any event preparation hours could jeopardize the event and the safety of White House staff, groundskeepers, event production personnel, UFC professional fighters, and event guests.  *See* id. ¶ 16.

*Permitting.*  On November 5, 2025, the National Mall and Memorial Parks Permits Office received a special event permit application from Ultimate Fighting Championship-TKO Group Holdings, Inc. (UFC) for use of areas associated with the Lincoln Memorial.  Richardson Decl. ¶ 11.  The only planned activity near the Lincoln Memorial is a press conference occurring on June 12, 2026.  Richardson Decl. ¶ 14.  The proposed event is not within the area restricted by 36 C.F.R. § 7.96(g)(3)(ii)(B) & (E) and is comparable to various past permitted special events in the same area.  Richardson Decl. ¶ 16.

*Ticketing*.  A public lottery for the UFC Freedom 250 event was opened on April 12, 2026.  More than 200,000 ticket requests have been received to date.  Americans from across the country have registered for and received free-of-charge tickets to UFC Freedom 250 events, and presumably have booked flights and other travel accommodations, hotel rooms, meal reservations, and other arrangements in expectation of a pre-scheduled date.

*UFC Partners*.  UFC professional athletes, contracted for this globally broadcast and highly anticipated fight, began physical preparations months in advance, with final weight-cutting and diet alterations already underway in expectation of a bout date of June 14, 2026.  Training for a UFC bout generally begins up to three months in advance, with fighters engaging in very specific preparation in anticipation of fighting a particular opponent.  In the final week before a fight, UFC fighters generally cut between 4.5% and 6.6% of their body fat, at times as much as 20 pounds in the week leading up to the weigh-in.  With a weigh-in pre-scheduled for June 13, 2026, final weight-cutting is already underway for the 14 UFC Freedom 250 participants.  In general, weight-

12

cutting within the final week before a fight includes fasting, extreme use of saunas, and hot Epsom salt baths.  Fisher Decl. ¶ 14.  Any delay of the UFC Freedom 250 bout date could jeopardize the health of the 14 professional athletes involved in the event, as prolonged weight cutting can result in heat injuries, urinary and kidney problems including kidney failure, seizures, and hypovolemic shock.  *See, e.g.*, Nemanja Lakicevic et al., *Effects of Rapid Weight Loss on Kidney Function in Combat Sports Athletes*, 57 Medicina 551 (2021).[8]

To date, White House security processes and efforts by the U.S. Secret Service have cleared over 2,000 individuals to participate in the UFC Freedom 250 production and broadcast. This clearance process has required hundreds of hours of data collection, submission, and review by all participating UFC subcontractors, UFC production personnel, White House staff, and U.S. Secret Service personnel.

UFC and UFC-affiliated organizations have spent more than $60 million preparing for the event.  Fisher Decl. ¶ 15. That sum would be all or mostly unrecoverable if the event is canceled. UFC has sourced a substantial volume of food and drinks in preparation for UFC Freedom 250. Perishable items sourced include food for over 4,000 South Lawn guests and over 120,000 Ellipse guests.  *Id*.

Following the event, plans are in place for disassembling the Claw beginning at 10:00am on June 15, 2026.  *Id*. ¶ 8.  Based on information presently known to the NPS, it is anticipated that all equipment will be removed from the area around the Lincoln Memorial by the end of June 14, 2026, and from the Ellipse and its surrounding area by June 23, 2026.  Richardson Decl. ¶ 21.

---

[8] https://perma.cc/83ZN-UAGV.

**LEGAL STANDARD**

A temporary restraining order, as with a preliminary injunction, is "an 'extraordinary and drastic remedy.'" *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). The moving party must make a "clear showing": (1) that it is "likely to succeed on the merits" of its claims; (2) that it is likely to suffer an irreparable injury in the absence of injunctive relief; (3) "that the balance of equities tips in [its'] favor"; and (4) that the proposed "injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20-22 (2008). The last two factors merge when the government is a party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

**ARGUMENT**

I.    THE COURT SHOULD DENY AN INJUNCTION BASED ON THE EQUITABLE FACTORS ALONE.

"[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest." *Kim v. Fin. Indus. Regul. Auth., Inc.*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023). Indeed, "[a]s a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018). This is rooted in the principle that a TRO, like a preliminary injunction, is "an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Here, because Plaintiffs inexcusably delayed—and in the meantime, allowed the government and public to develop strong reliance interests that would be disrupted by a late-breaking judicial intervention— a "first round knockout" denying relief based on the equities alone is more than warranted.

**A. Plaintiffs Sat on Their Hands and Cannot Establish Irreparable Harm.**

Preparations for the highly anticipated celebration of America's 250th birthday scheduled for the weekend of June 12-14, 2026, have been underway for nearly a year, yet Plaintiffs have delayed in bringing the instant lawsuit seeking "emergency" relief until merely days before the festivities are set to begin. The D.C. Circuit has described much shorter delays by plaintiffs as

"inexcusable," and sufficient to deny relief. *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (44 days); *see also Grundmann v. Trump,* 786 F. Supp. 3d 188, 193 (D.D.C. 2025) (explaining delay "reflects a lack of urgency inconsistent with irreparable harm"); *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (delay in seeking preliminary injunction "stands in stark contrast to the high bar the plaintiffs must clear to show irreparable harm"); *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 50 (1st Cir. 2021) ("We do not lightly grant emergency relief, especially where the emergency is largely one of plaintiff's own making and the relief sought *would interfere with processes on which many others have reasonably relied*."); *Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 33 (D.D.C. 2001) ("The case law is well-settled that 'a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted.'"); *Max-Planck-Gesellschaft Zur Forderung Der Wissenschaften E.V. v. Whitehead Inst. for Biomedical Rsch.*, 650 F. Supp. 2d 114, 123 (D. Mass. 2009) ("A party cannot delay the initiation of litigation and then use an 'emergency' created by its own decisions concerning timing to support a motion for preliminary injunction.").

Plaintiffs attempt to excuse their delay by claiming they only recently learned information needed to form a basis for their claim that the NPS regulations have been violated. They suggest that they were under a misunderstanding, stemming from an article published June 2, 2026, that a government entity was in charge of the event, but that a news article published two days later, on June 4, 2026, corrected that impression by revealing "that the UFC … is planning, organizing, and executing" the Freedom 250 events. TRO Br. at 6. Even taking those suggestions at face value— although they appear highly implausible—they do nothing to excuse Plaintiffs' delay. By June 2, 2026, when Plaintiffs' misunderstanding supposedly arose, their delay would already have

15

foreclosed prospective equitable relief. The UFC's role as a co-host and partner has been clear for many months in public reporting. *See supra* Background Part III. But even if Plaintiffs thought the Freedom 250 entity was in charge, nothing prevented them from bringing their four claims (Counts II through V) that do not hinge on which entity is in charge.

Courts sitting in equity ask "whether the plaintiff has inexcusably slept on his rights so as to make a decree against the defendant unfair." *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946). Here, Plaintiffs' delay "largely arose from a circumstance within plaintiffs' control: namely, their failure to plead the claims giving rise to their request for preliminary injunctive relief'" for almost a year, or at least since last September. *Benisek*, 585 U.S. at 159. Plaintiffs continued sitting on their rights while the government's well-publicized planning for Freedom 250 turned to action, and Plaintiffs "evidenced no urgency in obtaining relief." *Hanson v. D.C.*, 120 F.4th 223, 245 (D.C. Cir. 2024). Plaintiffs' delay alone justifies denial of their motion.

Even apart from their delay, Plaintiffs cannot show irreparable harm, which "must be both certain and great" to warrant injunctive relief. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Plaintiffs' principal alleged harms are aesthetic. For reasons explained further below, those alleged harms cannot cross the Article III threshold. *See infra* Part II.A. But even assuming they count as cognizable injury, they are not "permanent or at least of long duration." *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.,* ---F. Supp. 3d---, 2026 WL 877779, at *14 (D.D.C. Mar. 31, 2026); *see also Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987) ("Environmental injury," a form of aesthetic injury, "is often permanent or at least of long duration, *i.e.*, irreparable."). Rather, the Freedom 250 events will come and go after a single weekend. As for the Claw, it is a temporary fixture; disassembly is scheduled to begin on June 15, as soon as the events are over. Fisher Decl. ¶ 8

16

Plaintiffs would do well to follow the advice given in *Newdow v. Bush*, in which this Court instructed a plaintiff unhappy with President George W. Bush's inaugural activities in Washington, D.C., that "[h]e need not attend … in person or through television, radio or the internet."  355 F. Supp. 2d 265, 292 (D.D.C. 2005).  A truly irreparable harm could not be so easily avoided.

### B.  The Balance of Equities Weighs Heavily Against Relief.

Even if Plaintiffs could show irreparable harm, the Courts must weigh the equities to evaluate whether an injunctive remedy is an appropriate exercise of remedial discretion.  *See Winter*, 555 U.S. at 24 (explaining that a court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief" before issuing a preliminary injunction, which is "an extraordinary remedy never awarded as of right").  Here, Plaintiffs' aesthetic interests are dwarfed by the amount of time, labor, and funding that has been invested in reliance upon an understanding that the planned activities will take place.  Not to mention the excitement of fans and service members planning to attend or watch remotely.  Plaintiffs did nothing for months while these costs accrued.  On the equities, this is not a close call.

Defendants and the public have substantial reliance interests at stake.  Defendants have been planning this event for a year.  As recounted above, this includes 700 to 900 workers onsite since May 20; multiple truck deliveries per day; the promotion and coordination of 200,000 ticket requests; and the Secret Service's efforts to secure the grounds and clear each of these workers, deliveries, and attendees.  Seven government agencies and components have been involved in coordinating this event.  Moreover, the UFC fighters themselves have contracted to appear at the event, began their physical preparations long in advance, and have started final weight-cutting and diet alterations.  These will likely be the most significant and highly publicized fights of their professional careers.  There are also the expectations of service members, guests, and ordinary Americans who plan to visit D.C. to attend the event and have already booked travel and reserved

17

accommodations.  Again, there are expected to be roughly 4,000 spectators on the South Lawn and some 120,000 spectators on the Ellipse, in addition to millions of Americans watching remotely.

Meanwhile, Plaintiffs are two individuals: one who plans to walk past the event (intentionally "coming to the nuisance") and another who might happen to drive past it.  Two Plaintiffs with idiosyncratic preferences cannot use equity to upend an event of this cost and magnitude at the last minute and spoil the evenings of tens of thousands of other Americans who wish to celebrate their pride in their country in a manner that Plaintiffs disdain.  No one is holding Plaintiffs in a jiu jitsu lock, forcing them to watch UFC Freedom 250 against their will.  The public interest does not favor allowing them to exercise a heckler's veto, particularly at this late date.

## II.    PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS.

Plaintiffs' inexcusable delay in bringing suit and the lopsided balance of equities alone suffice to deny their emergency request, but their claims are also meritless.  At the outset, they lack Article III standing to challenge these events, and they have failed to join a required party, the UFC.  Regardless, the activities and events are plainly lawful.  As for the events on the South Lawn, Plaintiffs are limited to non-statutory *ultra vires* review, and they cannot remotely show that Section 8106 plainly and unambiguously forbids temporary fixtures, which are ubiquitous on White House grounds.  As for the press conference planned at the Lincoln Memorial, it has been properly authorized pursuant to NPS's permitting requirements, and Plaintiffs' contrary argument is entirely without merit.  Plaintiffs' alternative NEPA claim fails as to the South Lawn events because NEPA does not apply to presidential or EXR action, and the NPS had taken no final agency action with respect to the portion of the event on the South Lawn.  It also fails as to the events that were permitted by NPS outside of the White House grounds because NPS properly applied a categorical exclusion for actions, like those here, that normally do not have significant effects on the environment.

18

### A. Plaintiffs Lack Article III Standing.

Plaintiffs cannot sue to stop the Freedom 250 activities without first establishing that they have Article III standing to seek that relief. Article III requires plaintiffs to show a concrete and particularized injury-in-fact that is caused by the defendant's conduct and redressable by the court. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs cannot do so here.

*First*, Plaintiffs principally rely on "aesthetic" harm, but the D.C. Circuit has squarely held that "mere incidental viewership" of something subjectively displeasing is insufficient for Article III. *Envt'l Def. Fund v. FERC*, 2 F.4th 953, 969–70 (D.C. Cir. 2021) (*EDF*). In *EDF*, a plaintiff lacked standing to vindicate an aesthetic interest in stopping construction of a pipeline when she did "not even allege that she c[ould] see the new [pipeline metering station] from her property," which was more than "half a mile" away, and attested only that "she must look at an 'eyesore' several times per week when driving past." *Id.* at 790. She had "neither altered her behavior nor explained why she has any particularized connection to the land," thus reducing her "alleged aesthetic injuries" to "nothing more than generalized grievances, which cannot support standing." *Id.*; *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 390 n.3 (2024) (*Alliance*) ("this Court has long made clear that distress at or disagreement with the activities of others is not a basis under Article III for a plaintiff to bring a federal lawsuit").

Plaintiffs here fail to establish more than incidental viewership, so their standing is foreclosed by *EDF*. They do not describe how they use and enjoy the White House or Lincoln Memorial in a way that is unique from the general public. Their description of their harms bears a striking resemblance to the *EDF* plaintiff, who lodged a general grievance that "she must look at an 'eyesore' several times per week while driving past [a new pipeline]." *EDF*, 2 F.4th at 970. Ms. Douglas is displeased with viewing something she thinks is "hideous," Douglas Decl. ¶ 8, when she happens to visit the area. Mr. Romano claims he will miss "the opportunity to appreciate

19

the aesthetic beauty and coherence of President's Park, the White House, and the monuments on the National Mall *as I drive by them*." Romano Decl. ¶ 18 (emphasis added). What is more, Mr. Romano avers he works "as a ride-share driver" and merely speculates that he might drive by the Claw "on June 13 and 14" as "part of [his] work as a driver." *Id*. ¶¶ 5,17. That is far from certain to occur. Regardless, both Plaintiffs at most describe incidental viewership. Indeed, their case for standing is weaker than in *EDF*, because while the pipeline was permanent, the Freedom 250 events and the Claw will only remain up for a few more days.

Plaintiffs also fail to describe how the Freedom 250 activities will force them to "alter their behavior," except for Plaintiff Douglas' testimony that she plans to frequent the area *more* just to protest it. Douglas Decl. ¶ 6. A "self-inflicted harm doesn't satisfy the basic requirements for standing." *Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006); *see also Newdow*, 355 F. Supp. 2d at 292 (denying standing where plaintiff "has the means at hand to avoid [an] abstract injury"); *Ctr. for Biological Diversity v. United States Env't Prot. Agency*, 937 F.3d 533, 540 (5th Cir. 2019) ("someone who goes looking for pollution cannot claim an aesthetic injury in fact from seeing it."). Plaintiffs' failure to describe how their behavior has been altered underscores that this injury is merely a generalized grievance.

Plaintiffs' failure to describe any actual injury is even more stark regarding the press conference taking place at the Lincoln Memorial on June 12. Plaintiffs' claims allege harms from the face-off, which they incorrectly assert will be held at the Lincoln Memorial; it will actually occur at the Ellipse. Richardson Decl. ¶ 14. Only the press conference will occur at the Lincoln Memorial. *Id.* Plaintiffs initially believed the Lincoln Memorial event would occur on June 13 and attested that Ms. Douglas planned to be in the vicinity that day, for a protest, and that there was "a high likelihood" Mr. Romano would be driving by the Lincoln Memorial that day too.

20

Douglas Decl. ¶ 6; Romano Decl. 15.   Plaintiffs later realized the event at the Memorial was scheduled for June 12, and so advised the Court.   ECF 7, ¶ 4.   Their confusion over the dates resulted in a fatal mismatch between the actual event date and Ms. Douglas's sworn declaration that she will be there only the following day.   All that remains is an ideological objection, but Article III does not afford standing to "citizens [who] sue merely because their legal objection is accompanied by a strong moral, ideological, or policy objection to a government action."  *Alliance*, 602 U.S. at 381.

*Second*, in addition to their alleged aesthetic injuries, each Plaintiff alleges a separate harm that also fails as a matter of law.   Ms. Douglas alleges the Freedom 250 event will physically harm her based on the road closures associated with the event, but like those, the chain of causation is "circuitous" and "difficult … to navigate."  Douglas Decl. ¶ 14.   The argument, so it goes, is that Ms. Douglas has osteoarthritis, which makes walking and carrying things (as she plans to do when she protests the Freedom 250 events) difficult.   Ms. Douglas admits to doing more than a fair amount of walking out of her own volition, however; she attended the Walk for Peace on February 11, 2026; scouted a protest march route on March 22; marched that route on March 28; and attended a May Day march on May 1, "holding a large canvas replica of the U.S. Constitution," no less.  *Id*. ¶ 5.   Notwithstanding all this walking, she argues that road closures and restrictions associated with Freedom 250 will physically harm her, as they might extend the route she walks to get to her next protest destination.  *Id*. ¶ 14.   She anticipates that the pain she experiences will be exacerbated on June 14, as she intends to carry heavy props.   As with her alleged aesthetic harm, a "self-inflicted harm doesn't satisfy the basic requirements for standing."  *Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc.*, 468 F.3d at 831; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398,

21

416 (2013) (Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves.").

Nor is it clear that the injunction Plaintiffs request would actually alter the road closures.

For his part, Mr. Romano speculates that the noise associated with the activities planned at the Lincoln Memorial will resonate as far as the Vietnam Memorial and disrupt the tranquility of that sacred space; as a Vietnam veteran, he says that will harm his dignity. Romano Decl. ¶¶ 11-12. But Plaintiffs fail to establish that the noise will actually reach the Vietnam Memorial. Nor does Mr. Romano say that he intends to go to the Vietnam Memorial the day of the activity or that he will personally experience any of the disruption giving him concern. It is speculative that his rideshare clients will take him nearby. Romano Decl. ¶ 17 (speculating that "[a]s part of my work as a driver" there is "a high likelihood that I will be by the Claw on June 13 and 14"). Without any personal nexus to the hypothetical disruption, Mr. Romano alleges no more than "the psychological consequence presumably produced by observation of conduct with which one disagrees." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982); *see also Animal Legal Def. Fund v. Vilsack*, 640 F. Supp. 3d 134, 151 (D.D.C. 2022), ("purely psychic injuries arising from disagreement with government action … do not qualify" for standing); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998); *Diamond v. Charles*, 476 U.S. 54, 62 (1986) ("The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements."). "[N]ot all dignitary harms are sufficiently concrete to serve as injuries in fact," *Laufer v. Alamac Inc.*, 621 F. Supp. 3d 1, 8 (D.D.C. 2021), and this one definitively is not.

*Third*, insofar as Plaintiffs allege procedural harm, that does not confer standing because it is untethered to any concrete injury. A "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create

22

Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *see also Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 290 (D.D.C. 2017) ("[E]ven if the Court were to assume a NEPA violation, that procedural harm standing alone is insufficient to constitute irreparable harm.").

*Finally*, even if Plaintiffs could show cognizable injury, they lack standing to challenge the scheduled activities on the South Lawn because those events are neither traceable to Defendants nor redressable in this suit.  As discussed above, President's Park and the White House is dually administered by NPS and the White House.  Congress directed that "nothing done under [the Park's enabling legislation] shall conflict with the administration of the Executive offices of the President or with the use and occupancy of the buildings and grounds as the home of the President and his family and for his official purposes."  Pub. L. No. 87-286, 75 Stat. 586  (1961).  As a result, certain activities that take place at the park are conducted by the Executive Office of the President and are only coordinated with, and not authorized by, the NPS.  Stanwich Decl. ¶ 8.  Here, the Claw was erected and the events on the South Lawn were planned and authorized by EXR and the White House Office (components of the Executive Office of the President).  Yet Plaintiffs did not sue the White House or EXR.  Accordingly, Defendants did not cause the alleged aesthetic injury Plaintiffs claim stems from the Claw and the activities on the South Lawn, nor could this Court redress those alleged harms in this action.

### B.  Plaintiffs Failed to Join the UFC as a Required Party.

The Court must deny Plaintiffs' request for another reason: Plaintiffs failed to join a required party under Federal Rule of Civil Procedure 19, *i.e.*, the non-party UFC—which has contracted with the federal government to host UFC Freedom 250.  *See* Fed. R. Civ. P. 19.

A party is a required one if, without its participation, "the party's absence may, as a practical matter, impair or impede that party's ability to protect its interest," or if "the party's absence may

23

subject the existing parties to substantial risk of incurring multiple or otherwise inconsistent obligations." *Ali v. Carnegie Inst. of Wash.*, 306 F.R.D. 20, 25 (D.D.C. 2014), *aff'd* 684 F. App'x 985 (Fed. Cir. 2017).  Both are true here.  As documented above, the UFC has invested well over $60 million in bringing to life the activities planned for UFC Freedom 250.  Fisher Decl. ¶ 15.  The entirety of that sum would be unrecoverable if the event is canceled. Further, UFC has sourced a substantial volume of perishable food in preparation for UFC Freedom 250.  Those "financial interests would be highly prejudiced by . . . litigating [this] case in [UFC's] absence."  *Ali*. 306 F.R.D. at 26.  Defendants' contractual obligations to the UFC will also become impossible if the Court enters the requested relief; there is accordingly a "substantial risk of incurring multiple or otherwise inconsistent obligations."  *Ali*, 306 F.R.D. at 25.  UFC's presence is necessary so that it can protect interests in seeing those obligations met.  And there is no indication that UFC's joinder is not feasible or would deprive this court of subject-matter jurisdiction (assuming Plaintiffs have standing).

"[T]he nonjoinder of a necessary party is grounds to deny a preliminary injunction for failure to demonstrate a likelihood of success on the merits."  *Sunset Homeowners Ass'n, Inc. v. DiFrancesco*, 386 F. Supp. 3d 299, 307 (W.D.N.Y. 2019); *see also Boat Basin Inv'rs, LLC v. First Am. Stock Transfer, Inc.*, No. 03 Civ. 493, 2003 WL 282144, at *1 (S.D.N.Y. Feb. 7, 2003) ("In the absence of ... a necessary party under Rule 19(a) of the Federal Rules of Civil Procedure, the merits may not be reached and a preliminary injunction may not be granted.").  Until all the fighters are in their corners, this match cannot get started.

### C.  Plaintiffs' NPS Regulatory Claim Fails on the Merits.

Plaintiffs' regulatory claim is that aspects of the UFC Freedom 250 events cannot lawfully be permitted under NPS regulations.  That claim fails for multiple reasons.

24

*First*, with respect to the events at the Lincoln Memorial, Plaintiffs are simply wrong—the event is taking place in a location where special events *are* permitted under the regulations, and previously have been held.  *See* Richardson Decl. ¶ 16.  The NPS regularly permits both demonstrations and special events in that space.  *Id*. ¶ 17.  Plaintiffs' premise is mistaken.

*Second*, with respect to the events on the South Lawn, the NPS permit regulations are beside the point.  The White House is sponsoring and hosting this event, and the White House does not need a permit from NPS to host events on White House grounds.  Indeed, the purpose of the NPS permitting regulations is to ensure content-neutral treatment of events in designated public forums, but the South Lawn is not a public forum and is beyond the scope of those regulations.  Put another way, the NPS regulations bind NPS in how it allocates permits for events, but obviously do not restrict the President from hosting events at the White House.  *See* Bowron Decl. ¶ 16; Richardson Decl. ¶ 15; Stanwich Decl. ¶ 8.

*Finally*, even if the regulations applied and would otherwise prohibit the events, Plaintiffs acknowledge that NPS is specifically and expressly authorized by regulation to forego the normal event requirements for "special events planned, organized, and executed by executive departments and agencies or the Semiquincentennial Commission for the celebration of the 250th anniversary of American Independence."  36 C.F.R. § 7.96(g)(8).  The UFC Freedom 250 events fall within the scope of that exemption.  The press conference planned at the Lincoln Memorial is a special event planned, organized, and executed by NPS; the event on the South Lawn is being planned, organized, and executed by EXR.  Plaintiffs argue that these events cannot qualify because UFC is conducting the event in partnership with NPS, but nothing in the regulation precludes the agency from partnering with a private entity to host an event, and in fact, the NPS regularly conducts events with park partners.

25

For all of these reasons, there is no merit to Plaintiffs' regulatory objections.

### D.  Plaintiffs' Section 8106 Claim Fails on the Merits.

Plaintiffs' next argument is that erection of the Claw violates 40 U.S.C. § 8106, which states: "A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress."  That challenge is untenable, again for multiple independent reasons.

At the outset, and as explained above, EXR—a component of the White House—is the entity responsible for the planning and coordination of activities taking place on the South Lawn, including the construction of the Claw.  Fisher Decl. ¶ 4.  Yet Plaintiffs did not sue EXR or the White House, which is itself fatal to this claim.

Even if Plaintiffs had named EXR (or amended their complaint to do so), EXR is not an "agency" for purposes of the APA.  *See Sweetland v. Walters*, 60 F.3d 852, 853 (D.C. Cir. 1995); *Nat'l Tr. for Historic Pres. in the U.S. v. Nat'l Park Serv.,* 821 F. Supp. 3d 62, 72-73 (D.D.C. 2026).  Thus, Plaintiffs' only avenue to challenge this action would be their non-statutory *ultra vires* claim (Count IV).  But non-statutory *ultra vires* review has an "extremely limited scope," *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988), and an *ultra vires* claim "rarely succeeds," *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).  The *ultra vires* doctrine permits review of alleged statutory violations "only where," among other requirements, "the agency plainly acts 'in excess of its delegated powers and contrary to a specific prohibition in the' statute that is 'clear and mandatory.'"  *Nyunt*, 589 F.3d at 449; *see, e.g.*, *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022); *see also Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (requiring executive action "entirely" in excess of delegated powers and "contrary to a *specific prohibition*"). The D.C. Circuit has made clear that *ultra vires* review is not available to correct "mere legal" error.  *Fed. Express*, 39 F.4th at 764. "Garden-variety errors of

26

law or fact are not enough." *Griffith*, 842 F.2d at 493.  Given the stringency of those boundaries, such a claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nyunt*, 589 F.3d at 449.

Here, Plaintiffs have not identified any legal error at all, let alone one so blatant and obvious as to support an *ultra vires* claim.  Whatever else Section 8106 may mean, it does not prohibit *temporary* fixtures.  In ordinary meaning, "building" and "structure" refer to *permanent* structures. "Building," Black's Law Dictionary (12th ed. 2024) ("A structure with walls and a roof, esp. a permanent structure"); *State v. Sjogren*, 313 Or. App. 364, 367, 494 P.3d 1040, 1042 (2021) ("ordinary meaning of 'building' is 'any roofed and walled structure constructed for permanent use'"); *People v. Norcutt*, 115 A.D.3d 1306, 1307 (2014) ("the term 'building' has been alternatively defined as 'a constructed edifice designed to stand more or less permanently").  And longstanding practice resolves any residual doubt.  Temporary structures are ubiquitous on the White House grounds, erected for nearly every special event, yet nobody has ever before suggested that Congress somehow needs to pass legislation for every concert tent or Easter egg roll kiosk. Nor has Congress ever objected.  *See Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 783 (2025) ("considered and consistent Executive practice" can be a strong indication of ordinary meaning); Fisher Decl. ¶ 7.  "If Congress has continually declined to disturb a longstanding interpretation of a statute, that 'may provide some indication that Congress at least acquiesces in, and apparently affirms, that interpretation.'" *Wash. All. of Tech. Workers v. U.S DHS,* 50 F.4th 164, 182 (D.C. Cir. 2022).  No one raised a cavil at the Biden ice-rink or Elton John stage.  In light of the historic precedent of Presidents erecting temporary fortifications—and Congress acquiescing to those activities—there is no fair way to conclude that Defendants' view of Section 8106 constitutes a

27

"patent[] … misconstruction of the Act," as is required for an *ultra vires* claim. *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022).

As if that were not enough, Plaintiffs cannot enforce Section 8106 through *ultra vires* review because Section 8106 does not "confer rights upon the individual seeking ultra vires review." *Global Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025). It protects Congress's institutional interests, not private aesthetic preferences. The claim fails for this reason too.

### E.  Plaintiffs' NEPA Claim Fails on the Merits.

Plaintiffs' NEPA claims likewise fails on the merits. At the outset, NEPA's procedural requirements do not apply to the President's actions, or actions carried out by a non-agency component of the White House like EXR. *Tulare Cnty v. Bush,* 185 F.Supp.2d 18, 29 (D.D.C. 2001), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002) (dismissing a NEPA claim "because NEPA requires agency action, and the action in question is an extension of the President's action"). Plaintiffs have identified no NPS final agency action with respect to the UFC Freedom 250 event on the South Lawn and cannot assert a claim against the NPS for such activities, which were authorized by EXR. NEPA claims may only be brought under the APA, and EXR's actions are not subject to judicial review under the APA. *See supra* at *26.*

As for the events authorized at the Lincoln Memorial, NPS properly applied a NEPA categorical exclusion before permitting those activities. Bowron Decl. ¶¶ 12-14. Under NEPA, federal agencies may fulfill their obligation to analyze the potential environmental impacts of major federal actions through invocation of a categorical exclusion. *See* 42 U.S.C. § 4336(1). Categorical exclusions cover categories of actions that normally do not have significant effects on the environment, individually or in the aggregate, and therefore do not require a full environmental analysis unless extraordinary circumstances exist that make application of an exclusion

inappropriate. *Id*. These exclusions streamline agency NEPA review while providing several procedural safeguards. *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 735 (D.C. Cir. 2019) ("[CEs] are not exemptions or waivers of NEPA review; they are simply one type of NEPA review.").

Here, NPS properly applied a categorical exclusion to the proposed permitting action (a special use permit for the temporary activities proposed at the Lincoln Memorial and nearby locations outside the White House grounds) authorizing the portions of the event on the Ellipse and Lincoln Memorial. NPS determined in early May 2026 that a categorical exclusion set forth in the Department of Interior NEPA Handbook, Appendix 2, 12.5, D(5) applies. Bowron Decl. ¶ 12; Bowron Exhibit A. This categorical exclusion covers: "Issuance of permits for demonstrations, gathering, ceremonies, concerts, arts and crafts shows, etc., entailing only short-term or readily mitigable environmental disturbance." Bowron Exhibit A at 15. NPS documented its rationale for applying the exclusion. *See id*. For example, no permanent modifications are proposed and the action "involves temporary activities and infrastructure typical of large civic events, including tents, portable restrooms, generators, barriers, telecommunications equipment, media support, checkpoints, crowd management features, walkways, and related logistical elements." *Id.* Temporary environmental effects are "addressed through enforceable permit conditions and mitigation measures." *Id.* And NPS documented its analysis and determination that no extraordinary circumstances exist that would make application of the categorical exclusion inappropriate. *Id.* at 15-16; *see also* 43 C.F.R. § 46.215. This makes sense given that the event at the Lincoln Memorial is, at bottom, a press conference.

NPS's determination is entitled to "substantial deference." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168. 183 (2025). The Supreme Court recently clarified that

29

deference is the "bedrock principle" governing NEPA review. *Id*. at 185. Courts "should not micromanage ... agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 183. Given NEPA's deferential standard of review, and NPS's considered review of the event's anticipated effects, Plaintiffs fail to identify a NEPA violation regarding NPS's permitting actions.

Finally, the Supreme Court's instruction in the context of NEPA is that a procedural "deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more." *Id.* at 185. An extraordinary remedy like the relief Plaintiffs seek here—enjoining a highly anticipated event for all Americans celebrating the country's birth, squandering all the associated sunk costs—is not necessary to vindicate procedural interests.

## III. ALTHOUGH THE COURT SHOULD NOT GRANT RELIEF, ANY RELIEF SHOULD BE NARROW, SUPPORTED BY A BOND, AND STAYED PENDING APPEAL.

Before going to the scorecards for a decision, several final points bear mention.

*First*, "[t]he proposed injunction would alter 'the last uncontested status' before this suit." *Singh v. Berger*, 56 F.4th 88, 96 (D.C. Cir. 2022). "The purpose of a temporary restraining order or a preliminary injunction is to preserve the status quo." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 13, 16 (D.D.C. 2025). The White House, UFC, and the public have been preparing for and are set to host UFC Freedom 250. Issuing an injunction at the last minute would disrupt the status quo—not preserve it.

*Second*, Plaintiffs' request for relief is overbroad. For example, they seek to enjoin not just the UFC fight but the "use" of "the South Lawn as the venue for *any sporting event*," TRO Br. at 36 (emphasis added); this is well beyond the scope of the harms and would sweep in such longstanding practice as the White House tee-ball game. They further seek to enjoin Defendants from erecting any "structures" on the South Lawn, *id*. at 36, which again (on their interpretation)

30

would include common practices such as pavilion tents, bleachers, stages, bathrooms, and the like. As the Supreme Court as recently reaffirmed, equitable relief should be no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025); *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

*Third*, any injunctive relief must be accompanied by a bond reflecting the enormous investment by Defendants and their partners who are organizing this event. "[T]he court may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added); *cf. Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 606 U.S. —, 145 S. Ct. 2658, 2659 (2025) (staying district court injunction because plaintiffs did not say they would "repay grant money if the Government ultimately prevail[ed]" during appellate process). Here, the costs and damages sustained by Defendants, the UFC (which was required to be joined under Rule 19), the White House, and other partners is substantial. Tens of millions of dollars have been invested in an event that begins in just three days. Fisher Decl. ¶ 15. "[T]he costs and damages sustained" will total a seven- or eight-figure sum, and the bond required by Rule 65 should reflect that fact.

*Finally*, the Court should stay any injunctive relief pending appeal. In evaluating a request for a stay pending appeal, the Court considers "(1) whether the stay applicant … is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties … and (4) where the public interest lies." *Nken*, 556 U.S. at 426. These factors overwhelmingly favor a stay for all the reasons that Plaintiffs' motion fails. Defendants respectfully request that if the Court enters injunctive relief,

it rule on Defendants request for a stay pending appeal in the same order.  At minimum, Defendants request a brief administrative stay to permit an appeal to the D.C. Circuit.

## CONCLUSION

Plaintiffs' late motion and the starkly inequitable relief it seeks should be denied. Defendants and third parties have labored for months to organize the events beginning in just three days.  The work is nearly completed, and Plaintiffs' proposed temporary restraining order would upend instead of preserve the status quo.  For these reasons, Plaintiffs' Emergency Application for a Temporary Restrained Order should be denied.

Dated: June 9, 2026                              Respectfully submitted,

ADAM R.F. GUSTAFSON                         BRETT A. SHUMATE
Principal Deputy Assistant Attorney General  Assistant Attorney General
Environment and Natural Resources Division   Civil Division

BRADLEY CRAIGMYLE                           YAAKOV M. ROTH
Deputy Assistant Attorney General            Principal Deputy Assistant Attorney General

MARISSA A. PIROPATO                          ERIC J. HAMILTON
Deputy Chief                                 Deputy Assistant Attorney General

EMMA HAMILTON                                MICHAEL VELCHIK
Trial Attorney                               Senior Counsel
U.S. Department of Justice
Environment and Natural Resources Division   DIANE KELLEHER
Natural Resources Section                    Director
950 Pennsylvania Avenue, N.W.                JOSEPH E. BORSON
Washington, DC 20530                         Assistant Branch Director
Emma.Hamilton@usdoj.gov                      /s/ *Eitan R. Sirkovich*
202-305-5689                                 EITAN R. SIRKOVICH
                                             (D.C. Bar No. 90030102)
                                             Trial Attorney
                                             U.S. Department of Justice
                                             Civil Division, Federal Programs Branch
                                             1100 L Street, N.W.
                                             Washington, DC 20005
                                             Eitan.R.Sirkovich@usdoj.gov
                                             (202) 353-5525

*Counsel for Defendants*

33