**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SUSAN DOUGLAS,<br>PAUL ROMANO,<br><br>      Plaintiffs,<br><br>      v.<br><br>NATIONAL PARK SERVICE, *et al.*,<br><br>      Defendants. | Case No. 1:26-cv-2016 |

**DECLARATION OF JESSICA BOWRON, COMPTROLLER OF
THE NATIONAL PARK SERVICE, EXCERCISING THE DELEGATED
AUTHORITY OF THE DIRECTOR OF THE NATIONAL PARK SERVICE**

I, Jessica Bowron, declare as follows:

1. I am the Comptroller for the National Park Service ("NPS") and am exercising the delegated authority of the Director of the NPS pursuant to a January 20, 2025, delegation of that authority from the Acting Secretary of the Interior, and subsequent extensions of that authority by the Secretary of the Interior. I have been employed by NPS since 2007 and served as NPS Comptroller since 2017.

2. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3. In my current position as Comptroller, Exercising the Delegated Authority of the Director of the NPS, I oversee the management and operation of all units within the National Park System nationwide, as well as all NPS programs, NPS directorates, and regional offices. The White House and President's Park and the National Mall and Memorial Parks are administrative units within the National Park System in the NPS National Capital Region.

4. On January 29, 2025, President Trump signed Executive Order 14189, "Celebrating America's 250th Birthday." This Executive Order announced a national policy to provide a grand celebration worthy of the momentous occasion of the 250th anniversary of American Independence on July 4, 2026. Executive Order 14189 is publicly available at: https://www.federalregister.gov/documents/2025/02/03/2025-02231/celebrating-americas-250th-birthday.

5. On June 17, 2025, the NPS promulgated a temporary regulation that exempted America250 events, defined as events planned, organized, and executed by executive departments and agencies or the Semiquincentennial Commission from several restrictions in the National Capital Region's special regulations at 36 CFR 7.96 "in order to create efficiencies related to permit processing, event duration and location, priority use of park areas, equipment and structures, and to achieve the goals of Executive Order 14189." 90 Fed. Reg. 25,498.The temporary regulation also allows these events to be exempted from other requirements related to special events "upon a determination that such exemptions are necessary for the planning, organization, and execution of such events, after consideration of potential impacts to park resources and visitors." *Id.* The preamble to the temporary regulation specifically states that events subject to the rule may be planned, organized and executed by the White House. *Id.*

6. On January 30, 2026, the President signed Executive Order 14381 "Celebrating American Greatness with American Motor Racing," directing the Secretaries of Interior and Transportation to take steps in furtherance of the Freedom 250 Grand Prix event as part of the celebration of America's 250th Birthday. Executive Order 14381 is available at:

https://www.whitehouse.gov/presidential-actions/2026/01/celebrating-american-greatness-with-american-motor-racing/.

7. On January 30, 2026, the White House issued a Fact Sheet accompanying Executive Order 14381 that identified the UFC Freedom 250 Event as a presidential priority event celebrating America's 250th birthday. This fact sheet is publicly available at: https://www.whitehouse.gov/fact-sheets/2026/01/fact-sheet-president-donald-j-trump-celebrates-american-greatness-with-the-freedom-250-grand-prix-of-washington-d-c/.

8. I have been generally aware of the President's proposal to host an Ultimate Fighting Championship fight on the White House grounds since it was first announced in July 2025.

9. The NPS has been actively coordinating with the Executive Residence at the White House and other components of the Executive Office of the President regarding logistics and planning for the UFC event, which is now referred to as the UFC Freedom 250 Event, on the South Lawn since September 2025.

10. The UFC Freedom 250 Event is a Freedom 250 Signature Event co-sponsored by the Executive Office of the President with the portion of the event that will take place outside of the White House grounds cosponsored by the NPS. The events that will take place outside of the White House grounds include the weigh-in, concert, and viewing opportunities for the event itself to be held on the Ellipse on June 13 and 14, and the press conference to be held at the Lincoln Memorial on June 12. This event is considered an official Freedom 250 celebration associated with the national Semiquincentennial celebration.

11. In addition to cosponsoring the portion of the UFC Freedom 250 Event that is taking place outside of the White House grounds, the NPS is coordinating closely with components of

3

the Executive Office of the President and the production companies engaged (Harbinger and TAIT) to plan and execute the event. This has so far included a multitude of meetings and phone calls between the various groups, as well as NPS's preparation of NPS lands in anticipation of the event. Throughout the event, the NPS Incident Management Team (IMT) will coordinate support and emergency response for both the Lincoln Memorial and the Ellipse. After the event, the NPS IMT will draft an After-Action Report (AAR) in order to document and absorb lessons learned.

12. On May 13, 2026, the NPS completed a Categorical Exclusion Documentation form ("CE Form") for the portions of the event on the Ellipse and at the Lincoln Memorial, to comply with the National Environmental Policy Act (NEPA). The CE Form was signed by the superintendent for the NPS National Mall and Memorial Parks and the NPS Liaison for the White House, both of whom are NPS officials under my supervision. A true copy of the CE Form is attached as Exhibit A.

13. As documented in the CE Form, the NPS concluded that the issuance of a special event permit for the event "qualifies for application of DOI NEPA Handbook Appendix 2, NPS 12.5 D(5),which applies to issuance of permits for demonstrations, gatherings, ceremonies, concerts, arts and crafts shows, and similar events that entail only short-term or readily mitigable environmental disturbance." Exhibit A at 9.

14. The NPS also considered whether any of the extraordinary circumstances identified in the Department of the Interior's NEPA implementing regulations applied, and documented its finding in the CE documentation form that none did. Exhibit A at 9-13.

15. I anticipate that, consistent with its standard practice, later this week, and prior to the event itself, the NPS will issue an amended version of this permit authorizing all of the permitted

activities, including the event itself and the demobilization and removal of equipment, to both UFC/TKO and the NPS as co-permittees. I expect that an NPS official will sign the special event permit on behalf of NPS.

16. The NPS does not issue special event permits for events on the White House grounds and will not be issuing a special event permit for the portion of the UFC Freedom 250 Event that is to take place on the South Lawn of the White House.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 9, 2026.

JESSICA
BOWRON

Digitally signed by JESSICA
BOWRON
Date: 2026.06.09 19:49:30 -04'00'

Jessica Bowron

5

# EXHIBIT A

**National Park Service**
**U.S. Department of the Interior**

**National Mall and Memorial Parks**

# Categorical Exclusion Documentation Form (CE Form)

**Project:** Ultimate Fighting Challenge (UFC) Freedom 250

**PEPC Project Number:** 134907

**Description of Action (Project Description):** SITE DESCRIPTION
The National Register listed National Mall Historic District contains the Area of Potential Effect (APE) of the project. The National Mall is located on the banks of the Potomac River in the city of Washington, D.C. The boundaries of the National Mall Historic District encompass approximately 692.45 acres in the northwest and southwest quadrants of the city, forming a monumental core within a densely populated urban area. The Federal government appropriated the lands in 1792 for public use, as well as man-made parkland reclaimed from the Potomac River in the late nineteenth century. It has its origins in two seminal plans for the national capital - the 1791 L'Enfant Plan and the 1901-02 McMillan Commission Plan - and its evolution represents over two centuries of development. The APE includes the component landscapes of West Potomac Park and Presidents Park South.

The Lincoln Memorial cultural landscape is a component landscape of West Potomac Park (Reservation 332). It is located on the eastern bank of the Potomac River in the monumental core of the District of Columbia, bridging the axis between the southwest and northwest quadrants of Washington, D.C. The title ascribed encompasses 83 acres and includes the Lincoln Memorial structure and circle, Reflecting Pool, the John Ericsson Monument, the Watergate Steps area, and the Belvedere at Peters Point.

Occupying a total of 52 acres in the center of Washington, DC, Presidents Park South has comprised the grounds south of the White House (also historically known as either the Presidents House or the Executive Mansion) of the American President since 1791(Mackintosh 1980: 7.3). Situated in the heart of the nations capital, the park is bordered on its north side by State Place, South Executive Avenue, and Hamilton Place; to the east by 15th Street, NW; to the south by Constitution Avenue, NW; and to
the west by 17th Street, NW. Descending in a gradual, gently sloping lawn south from the White House Grounds, the park features the Ellipse at its center, Sherman Park in the northeast corner, and the First Division Monument in the northwest corner. On either side of the Ellipse, near the border with 15th and 17th Streets, a variety of deciduous trees and some conifers serve to frame the sweeping vista looking south toward the Washington Monument and Jefferson Memorial.

PURPOSE AND NEED
The purpose of the proposed action is for the National Park Service (NPS) to issue a Special Use Permit (SUP) authorizing temporary event activities associated with the Ultimate Fighting Championship and related America 250 programming within portions of the NAMA portfolio, including the Lincoln Memorial Grounds and the Tidal Basin. The permit would allow temporary occupancy and use of designated park areas for a press event, associated temporary infrastructure, crowd management, security operations, media support, and related logistical functions necessary to conduct the event safely and effectively, consistent with NPS policies governing special park uses and protection of park resources.

The action is needed because NPS is responsible for managing the Lincoln Memorial Grounds, Tidal Basin, and related areas of West Potomac Park as nationally significant commemorative and civic landscapes that regularly accommodate public gatherings, ceremonial activities, and nationally significant events. The proposed event is associated with the broader America 250 commemorative effort and is intended to support temporary public programming within these iconic civic

7

spaces.

Because the event footprint is located within National Register-listed and eligible historic properties and cultural landscapes, NPS must evaluate and authorize the use through a structured permit process that establishes enforceable conditions for resource protection, defines the spatial and temporal limits of the event, and coordinates security, operations, media activity, visitor access, and restoration. Issuance of the SUP is therefore needed to ensure that temporary event activities occur in a manner that protects historic properties, cultural landscapes, archeological resources, vegetation, infrastructure, and public use.

PROPOSED ACTION

Executive Order 14189 Celebrating America's 250th Birthday directs federal agencies to prepare for the 2026 semiquincentennial with projects that honor American heritage and enhance public spaces. The National Park Service (NPS) at the National Mall and Memorial Parks (NAMA) has executed numerous projects per the EO in preparation for the multitude of events planned/being planned in and around the National Mall and Memorial Core to celebrate the semiquincentennial.

Ultimate Fighting Challenge Programming:

-Ultimate Fighting Challenge Press Conference will be held at the Lincoln Memorial steps on June 12th at 8PM.
-Ultimate Fighting Challenge Fan Fest (weigh-in, concert, etc.) will be held on the Ellipse on June 13.
-Ultimate Fighting Challenge event (fights) will be held on the South Lawn of the White House grounds on June 14.
-The build will begin on June 7th.
-Due to the extent of the area at the Ellipse, Constitution Ave will have closures on Saturday, June 13th for the Mag locations.
-Load in for the Ellipse will begin on May 24th.
-Demobilization for the Ellipse will begin on June 15th and end June 22nd.
-Possible Fireworks finale on June 15th at the Tidal Basin including (9) nine 40-second bursts and the finale fireworks will be 10-minutes-long.

Events are rain or shine. Temporary structures may include but are not limited to the following: tents, pavilions, portable restrooms (trailers and/or port-a-potties), generators, stages, walkways, food kiosks/food trucks, dumpsters, COWs, COLTs, and/or other similar structures required or requested to successfully put on the event.

Event support activities may include space for emergency and safety personal stations, equipment and checkpoints, media and telecommunication equipment, area/road closures, safety, and resource protection barriers, restrooms, media, demonstration and spectator areas.

Power sources, water sources, and staging areas for equipment may also be required and will be determined for each event.

Law enforcement may include US Park Police, contracted security, and depending on the VIPs attending the US Secret Service (with checkpoints or other safety features such as magnetometers) may be a National Special Security Event (NSSE).

Common resource protection mitigations include (the Mitigation tab under 4 Natural/Cultural Compliance contains the full suite of mitigation measures):
-Stone/paver for cultural resource protection

-Turf and tree protections; approved turf matting or blankets, tree root protection, pre-event tree pruning (conducted by NAMA Tree Crew). No trimming or removal of vegetation should take place without prior approval from NAMA.

-Wildlife monitoring; trapped in fenced/barriered areas, injured or dead. In the event this happens the incident should be documented and the NPS Incident Command Team (ICT) Resource Advisor (READ) or NAMA Acting Chief of Resource Management contacted.

-Waste Management; ensuring all event waste containers have lids, that waste does not get released into the environment and

doesn't attract pests, waste is disposed of off-site and in the correct manner.

-Stormwater Management; ensure all newly exposed soil is stabilized as soon as possible to mitigate any erosion or sedimentation issues. Stabilization should follow the NAMA turf management plan and should include all natural fiber erosion control blankets or straw.

-Hazardous Materials Storage and Containment; ensuring spill kits are readily available where fuel containing equipment will be stationed, ensure no equipment or hazardous materials are leaking, ensure Safety Data Sheets (SDS) are onsite with materials, stationary fuel containing equipment within 50ft of a body of water is within secondary containment.

SIGNIFICANCE

The National Mall Historic District is nationally significant under Criterion A in the areas of politics and government, ethnic heritage (black), social history, education, and entertainment and recreation. The historic district is significant for its relationship to the establishment of the permanent capital of the United States and continues to serve as the public space linking the executive and legislative branches of the federal government. Since the late nineteenth century, the National Mall has functioned as a gathering place for American citizens to celebrate national events and anniversaries and to exercise their First Amendment rights of free assembly and free speech in efforts to influence politicians actions regarding issues of national importance, including equal rights, military involvement, and social and environmental policy.

The National Mall Historic District is nationally significant under Criterion C in the areas of architecture, art, community planning and development, engineering, and landscape architecture. Within its boundaries are buildings and landscape features that represent significant design trends in the nations history, such as the Romanesque Revival of James Renwicks Smithsonian Castle, the Egyptian Revival obelisk of the Washington Monument, and the City Beautiful organization of the entire ensemble. The National Mall Historic District contains works that possess high artistic value, such as the Lincoln Memorial, and that represent the work of master designers, including John Russell Pope, who designed the National Gallery of Art West Building. Together, the buildings, memorials, fountains and other water features, walks and roads, trees, lawns, and plantings of the National Mall Historic District constitute an urban landscape unlike any in the country.

The National Mall Historic District is also locally significant under Criterion D as a property that has yielded or is likely to yield information important in prehistory or history. The district derives significance from a site in Presidents Park and from four sites primarily associated with the citys nineteenth-century infrastructure and urban development. The sites include two related to the Chesapeake & Ohio Canal (the Lockkeepers House and Lock B sites) and two associated with the development of the citys infrastructure (Washington City Canal and Tiber Creek Sewer sites).

The National Mall Historic District meets Criteria Consideration B (moved properties) for moved resources. The moved properties within the historic district are the Lockkeepers House near the intersection of Constitution Avenue and 17th Street, NW, the Bulfinch Gateposts and Gatehouses along Constitution Avenue. The National Mall Historic District also meets Criteria Consideration F (commemorative properties) as the largest and most significant commemorative landscape in the United States. Several of the commemorative works within the district satisfy Criteria Consideration F as the primary national monuments to individuals and events significant in the nations history, including presidents and military conflicts. These monuments and memorials signify the broader cultural attitudes and represent the value placed on the commemorated subjects by their sponsors. The National Mall continues to serve as a canvas upon which successive generations of local citizens and communities have written the story of the events, people, and organizations that have shaped our society. Finally, the National Mall Historic District meets Criteria Consideration G (properties having achieved significance within the last fifty years) for its exceptional significance as a continuation of the nations symbolic core and public gathering space, for the planning principles laid down in the LEnfant and McMillan plans, as the location of nationally significant works commemorating more recent American history and more recent buildings housing artifacts from our national collections, and as an ongoing site for national celebrations and expressions of constitutional rights.

The Lincoln Memorial Grounds cultural landscape has three periods of significance: Lincoln Memorial: 1791-1914 (representing the site preparation period) and 1914-1933 (the construction period). A third period of significance, 1939-

9

present, to recognize the significance of this cultural landscape in the Civil Rights Movement and other protest events. This period begins with Marian Andersons concert on the Lincoln Memorial steps in 1939 and continues to the present as an acknowledgement of its lasting symbolism and ongoing use for civic protest. Regarding the National Register of Historic Places, the cultural landscape is eligible for inclusion under Criteria A and C. Under Criterion A, the site derives local significance in the area of Entertainment/Recreation, as a recreational and memorial landscape that was first conceived in the 1791 LEnfant Plan and was a key facet of the 1901McMillan Plan. National significance is documented in the areas of Ethnic Heritage-Black, Social History, and Politics/Government, as the site of landmark civil rights events and protests, including Marian Andersons 1939 concert and Martin Luther King, Jr.s 'I Have A Dream' speech at the 1963 March on Washington for Jobs and Freedom. Under Criterion C, the cultural landscape is eligible for inclusion in the National Register of Historic Places in the areas of Architecture, Art, and Landscape Architecture, as a significant memorial landscape developed by renowned designers such as Henry Bacon, Daniel Chester French, Frederick Law Olmsted, Jr., and others. Their design defined the western end of the National Mall, transforming the Potomac Flats into a nationally significant portfolio of architectural, artistic, and landscape architectural features that embody the highest principles of 20th-century memorial landscapes and urban design. The cultural landscape meets Criteria Consideration F (commemorative properties), as it is the primary national monument to President Abraham Lincoln and the reunification of the country after the Civil War. It also meets Criteria Consideration G (properties having achieved significance within the last 50 years), as it continues to be one of the most recognizable public spaces in the country, utilized for civic gatherings and protests.

As a landscape closely associated with the Presidents of the United States, Andrew Jackson Downing, several other preeminent landscape practitioners, and nationally renowned sculptors, Presidents Park South is a unique resource with national significance. More specifically, it meets National Register Criteria A, B, and C for its contribution to broad patterns of American history and landscape design, association with the lives of persons significant to our past, and its representation of the distinctive styles and specific characteristics of some of the nations foremost planners, designers, landscape architects, and sculptors. In addition, several of the landscape features within Presidents Park South also meet Criterion Consideration F for their exceptional commemorative value. The historic period of significance for the park is defined as 1791 through 1947, lasting from the initial establishment of LEnfants plan identifying this tract as the heart of the federal city, to the completion of the primary north-south axial design laid out by both LEnfant and the McMillan Plan; a vista captured at last with the clearing of the 150-foot wide view south to the newly-constructed Jefferson Memorial. Presidents Park South has been listed on the National Register of Historic Places since May 6, 1980.

**Project Locations:**

**County, State:** District of Columbia, DC
**District:** Reservation 332
**Section:** West Potomac Park

**County, State:** District of Columbia, DC
**District:** Reservation 1
**Section:** President"s Park

**County, State:** District of Columbia, DC
**District:** Reservation 2
**Section:** Washington Monument Grounds

**County, State:** District of Columbia, DC
**District:** Reservation 332
**Section:** West Potomac Park
**Geo. Marker:** Tidal Basin (Subsection)

**County, State:** District of Columbia, DC
**District:** Reservation 332
**Section:** West Potomac Park
**Geo. Marker:** LINC Memorial (Subsection)

**Mitigation(s):**

- The undertaking shall avoid placement of a feature within a character defining view, vista, or axial relationship that it crucial to the design of either a landscape plan or a commemorative work design.
- Proposed undertaking will allow for First Amendment activities to occur during the construction / installation phase, as well as during the duration of the proposed undertaking.
- Fireworks displays will be conducted in compliance with the National Fire protection Association Code for the Display of Fireworks (NFPA 1123). NPS Management Policies 2006, Use of Parks 8.6.2.3
- Equipment and materials staging areas will avoid known archeological resources.
- Project staging/laydown shall be located in areas free and clear of any archeological concerns.
- Any park infrastructure impacted during construction, including but not limited to paved and unpaved roadways, walkways, turf, shall be restored to pre-construction conditions upon completion of the project.
- Work area shall be cleaned daily to remove generated litter.
- When feasible the project shall follow NPS EO 13693 (ii) diverting at least 50 percent of non-hazardous solid waste, including food and compostable material, construction and demolition materials and debris, and pursuing opportunities for net-zero waste or additional diversion opportunities.

  The waste diversion tracking sheet and or disposal manifest needs to be reported to the park Environmental Compliance Program Manager monthly for the duration of the project and or at the end of the project. The park tracks this to meet the NPS EO 13693 of diverting (recycling) at least 50 % of our solid waste generated. This is reported to WASO annually.
- Contractors are responsible for acquiring and adhering all local, state and federal permits.
- Comply with all legal load restrictions in the hauling of materials. Load restrictions on park roads are identical to state load restrictions with such additional regulations as may be imposed by the Park Superintendent. Information regarding rules and regulations for vehicle traffic on park roads may be obtained from the Chief Ranger's office. A special permit will not relieve the Contractor of liability for damage which may result from moving of equipment.
- Guidelines for Fuel Containment and Refueling at NAMA:

  Fuel Containment
  - Fuel containers of 55 gallons or more capacity containing flammable or toxic liquid shall be surrounded by dikes or pans which enclose a volume equal to at least 35 percent of the total volume of the containers.
  - Fuel containment is required for ALL fuel caches.
  - Storage areas shall be kept free of weeds, debris, and other combustible material not necessary to the storage.
  - Fuel should not be stored within 50 feet of water or a storm drain. If fuel is stored under 50 feet of a storm drain, place temporary cap seals over nearby catch basins or manhole covers to prevent any spills from entering the storm drain.

  Refueling Locations
  - Refueling of any type, whether equipment or vehicles, must be done on non-pervious surfaces such as concrete or asphalt.
  - All refueling of equipment shall have a drip pan and spill containment pads in position prior to refueling activities.
  - Spill containment kits and fire extinguishers shall be available on site at all times.
  - Fire extinguishers adequate in number and suitable for the hazard shall be provided. These extinguishers shall be located in the immediate area where pressure vessels, drums and containers containing flammable liquids or gases are stored or in use. Such extinguishers shall be ready for use at all times. At least one portable fire extinguisher having a rating of not less than 20-B:C and should not be less than 25 feet, nor more than 75 feet, from any flammable liquid storage area located outside.
  - Discourage 'topping off' of fuel tanks.
  - Inspect the fueling area for leaks and spills.
  - Notify NAMA Resource Management immediately of any spills

11

Preventative Measures for Known Leaking Vehicles

- Have drip pans under each leaking area under the vehicle. Absorbent pads should be located under the drip pan covering an area up to 2 times the size of the drip pan.
- A bag of dry absorb should be located at each leaking vehicle along with an appropriate sized hazardous waste bag to dispose of all of the absorbent materials.
- Nearby catch basins and storm drains should be covered with socks that have the appropriate specifications to absorb oil/fuel.

Spill/Leak Clean Up

- Any spills/leaks should be cleaned up immediately.
- Notify NAMA Resource Management immediately of any spills
- If there is a spill, all the used spill material must be treated as hazardous waste, disposed off site at an appropriate location and provide a disposal manifest to NAMA.

- Temporary utilities such as sound poles, light towers, colts, cows etc... shall be placed at approved location with approved protection methods in places. IE, secondary containment, turf protections, hard scape etc
- A portable generator must have secondary containment and be used on hardscape away from storm drains or waterways.
  All refueling of equipment shall have spill containment pads in position prior to refueling activities.
  Spill containment kits and fire extinguishers shall be available on site at all times.
  Portable generators should be low-emission, fuel efficient, and contain noise reduction features.
  To reduce emissions and noise pollution, portable generators should be run only when necessary.
- Construction equipment will be in satisfactory condition; i.e., it will be equipped with required safety components and not be leaking hazardous liquids or emitting hazardous or undesirable fumes above allowable legal limits. (9.1.3.1, NPS Management Policies 2006)
- Discharge anything other than precipitation into these bodies of water either through the stormdrains or through runoff is prohibited without the proper permit or authorization.
- Managing Animals in an Educational Setting
  Venue operators and staff should be aware that certain populations are more likely than others to develop serious illness from diseases transmitted in animal contact settings. These groups include:
  - Children under 5 years of age
  - Adults over 65 years of age
  - Pregnant women
  - Immunocompromised individuals
  Pathogen shedding can be enhanced by stress induced by transportation, confinement, physical crowding and increased handling; caretakers should be aware of this risk and take steps to minimize each of these where possible.
  Animal handlers and managers should be aware of what signs of stress look like in species on exhibit and observe appropriate display and break period recommendations for those species. Additionally, housing multiple species within a single exhibit can also lead to increased disease transmission and is not recommended.
  Whenever the public is permitted to directly contact exhibited animals, supervision by experienced animal caretakers should be enforced for human and animal safety.
  Animals displaying signs of illness should be removed from the exhibition setting and a veterinarian should be notified.
  Direct contact with species that could serve as an unvaccinated reservoir for Rabies virus(bats, raccoons, skunks, foxes, and coyotes) should not be permitted.
  All domestic animal species with potential contact should have a current rabies vaccination and be under the care of a local veterinarian.
  Direct contact with species that can produce venom, feature excessive strength or are unpredictable in nature should not be permitted. Species of primary concern include: non-human primates, certain carnivores (lions, tigers, ocelots, wolves, wolf hybrids and bears) and venomous species.
  If reptiles or amphibians are on display, the public should have no interaction with the tanks, water, filtration

12

equipment or other tank contents.

Reptiles smaller than 4' should not be touched or held by the public.

Consider appropriate signage explaining the importance of handwashing after interacting with reptiles and amphibians.

For children under 5, no pre-weaned calves, reptiles, amphibians or live poultry (including chicks) should be used for direct contact.

- Managing Human Health in Settings with Animals

Visitors should receive educational messages before entering a live animal exhibit, including information that animals can cause injuries and spread germs that may result in serious illness in people, and that proper handwashing is the best way to prevent illness. This messaging can be explained by park representatives or conveyed on readily visible, easily understood signs. Refer to Animals in Public Settings Guidelines

For any instance when there is direct contact between human and animals, handwashing stations and public education promoting handwashing behaviors should be provided.

Food and drink products should not be consumed in animal areas

The flow of visitor traffic should be arranged in such a manner that visitors travel through transition areas in between animal areas and non-animal areas.

Raw milk products should not be produced, distributed, sold or consumed on park lands, as these can carry bacteria that cause illness in humans

Horned animals should not have direct contact with the public.

For any instance when an animal bites a human on NPS lands, park representatives should comply with local and state requirements for reporting animal bites and consider the possibility of rabies transmission.

- Managing General Animal Health

All captive animals within the park setting should be in good health while they are being used or displayed so as to promote animal welfare and prevent the transmission of infectious diseases.

All animals should be inspected by a veterinarian at minimum on an annual basis. This could include annual courtesy checks performed by the USDA. Work with your veterinarian to establish records for the health of the herd. Ferer to policies in your state regarding vaccinations and preventative care.

All animals should have a certificate of veterinary inspection (CVI) updated on an annual basis, if crossing state lines. Concessionaires and contractors providing animals for use within NPS should also provide a CVI for all provided animals.

Animals should be housed in appropriate, clean, low-stress environments and should be permitted to enter off-display areas for rest periodically for livestock and at the animals discretion for wildlife species. Animals in outdoor exhibits should be provided access to shade.

Animal caretakers and managers should monitor animals daily for signs of illness. When animals appear ill, they should be separated from group conspecifics (when applicable), removed from work or exhibition duties, and a veterinarian should be notified.

Only trained staff should assist in handling, moving, or restraining animals.

- Spill kits shall be onsite and readily accessible anytime hazardous materials including fuel and/or oil are brought into the park. Secondary containment of these materials is required at all times.
- A portable generator must have secondary containment and be used on hardscape away from storm drains or waterways.

All refueling of equipment shall have spill containment pads in position prior to refueling activities.

Spill containment kits and fire extinguishers shall be available on site at all times.

Portable generators should be low-emission, fuel efficient, and contain noise reduction features.

To reduce emissions and noise pollution, portable generators should be run only when necessary.

- • Portable restrooms should be placed 100 feet from waterways and 50 feet from storm drains. Ideally placement should be out of high flood risk areas.

• The portable bathroom should be placed on a level surface with unobstructed access to a pumper/service truck.

• Contact for maintenance should be clearly labeled on the outside/inside of the portable bathroom.

• Hand wash/sanitation stations should be within 10 from the portable restrooms.

• A spill response plan and spill kit must be maintained on site and provided to NAMA in addition to being in every service vehicle.

• Temporarily cover nearby storm drain inlets to prevent wash water/spills from entering the storm drain

when servicing. If not possible protect inlets and/or water bodies.
- Any spills occurring during servicing will be cleaned immediately and contaminated items disposed of in accordance with all Federal and District of Columbia regulations.
- If the portable bathroom is damaged, it needs to be repaired/replaced immediately.
- All wastewater must be disposed of off site at a permitted wastewater facility. NAMA Resource Management must be notified immediately if there is any discharge of sanitary/wastewater into the catch basin or outside of the portable bathroom unit.
- Extra care must be taken during servicing of the portable restroom to minimize any leaks/spills
- All chemicals and cleaning agents must be securely stored on the service trucks for maintenance/emptying.
- All hoses, couplings, and tanks on the service truck should be maintained in good condition.
- BMPs for Fireworks Near Navigable Waterway of the US:

Pollution Prevention
Use alternative (e.g., biodegradable) fireworks materials and/or select an alternative debris fallout location based on readily available meteorological data to eliminate or reduce residual firework pollutant discharges to waters of the United States

Pollution Identification
Describe activities conducted within the firing range that have a potential to release pollutants and identify the potential pollutant sources associated with each activity.

Pollution Control
Provide measures of controlling pollutant discharges during the firework operations and cleaning up the fallout areas to minimize the potential adverse effects of pollutant discharges after the firework displays. These measures shall represent the best available technology and is economically achievable.

At a minimum, the Plan shall include the following BMPs to the extent practicable and economically achievable:
1. Use alternative fireworks that replace perchlorate with other oxidizers and contain biodegradable components.
2. Use fireworks that do not contain plastic outer casings or have non-biodegradable inner components.
3. Use propellants that burn cleaner, produce less smoke, and reduce residual firework pollutant discharges to surface waters.
4. Select firing range locations based on readily available meteorological data and designs that reduce residual firework pollutant discharges.
5. Secure all pyrotechnic equipment and fireworks in a manner that minimizes the risk of such materials and objects entering receiving waters before, during, and after fireworks displays.
6. Inspect each firework launch area for potential safety issues on an ongoing basis.
7. Perform visual observations and monitoring activities to assess BMP performance.
8. Prior to fireworks displays, set up a retaining wall/fence or other barrier around 3 of the 4 sides of the launch site to control the mobility of fireworks debris, particulate matter, and to avoid fuses and other debris falling into the surface water.
9. As soon as practicable after fireworks displays, conduct BMP effectiveness evaluations.
10. Whenever practicable, feasible, and safe, remove all plastic and aluminum labels and wrappings from aerial shells and special effect pyrotechnic devices before they are launched.
11. Describe in the Plan how shells and special effect pyrotechnic devices will be secured during the firework show and the plan to collect all firework related wastes following fireworks event.
12. As soon as practicable, and no later than 12 hours following a public display of fireworks, collect, remove, and manage particulate matter and debris from ignited and un-ignited pyrotechnic material including aerial shells, stars (small pellets of composition that produce color pyrotechnic effects), paper, cardboard, wires and fuses found during inspection of the entire firing range, nearby shoreline and adjacent affected surface water(s) in add
13. Other than system firing cables and common or grounding wires intended to be recovered after the display,

secure electric igniter wires used to trigger the fireworks to minimize the risk that the wires fall into the water during or after the discharge.

**CE Citation:** DOI NEPA Handbook, Appendix 2, 12.5, D(5), (Feb. 2026). Issuance of permits for demonstrations, gathering, ceremonies, concerts, arts and crafts shows, etc., entailing only short-term or readily mitigable environmental disturbance.

**CE Justification:** The proposed action qualifies for application of DOI NEPA Handbook Appendix 2, NPS 12.5 D(5), which applies to issuance of permits for demonstrations, gatherings, ceremonies, concerts, arts and crafts shows, and similar events that entail only short-term or readily mitigable environmental disturbance. The National Park Service proposes to issue a Special Use Permit authorizing temporary event activities associated with the Ultimate Fighting Championship within portions of West Potomac Park and the Washington Monument Grounds under NAMA jurisdiction, including a press conference at the Lincoln Memorial steps and possible fireworks at the Tidal Basin, together with temporary support infrastructure, security features, media facilities, and visitor management elements.

The undertaking involves temporary activities and infrastructure typical of large civic events, including tents, portable restrooms, generators, barriers, telecommunications equipment, media support, checkpoints, crowd management features, walkways, and related logistical elements. Based on the project description and NHPA review, no permanent modifications to park resources are proposed and no ground disturbance is proposed within the National Mall and Memorial Parks (NAMA) portfolio. All event infrastructure would be temporary, removable, and subject to removal at the conclusion of the permitted event.

Potential environmental effects would be temporary, localized, and readily mitigable, consisting primarily of concentrated pedestrian use, temporary closures, noise, lighting, minor turf stress or soil compaction, waste generation, short-term visual changes within historic settings, and possible short-duration fireworks-related disturbance if that component proceeds. These effects are well understood based on prior temporary events within the National Mall and Memorial Core and are addressed through enforceable permit conditions and mitigation measures, including turf and tree protection, hardscape protection, waste management controls, stormwater stabilization, hazardous materials containment, wildlife monitoring, and restoration obligations.

Review conducted pursuant to the National Historic Preservation Act (NHPA) determined that the undertaking, as currently proposed, will result in No Adverse Effect on historic properties, and the project is undergoing a Standard 4-Step Review with the DC SHPO due to the scale and scope of the event. The Area of Potential Effect (APE) includes portions of West Potomac Park and the Washington Monument Grounds and contains numerous historic properties, cultural landscapes, archeological resources, and ethnographic resources. The NHPA review found that temporary event infrastructure may temporarily affect the setting and feeling of these resources, but that such effects would be reversible and not sustained. Historic structures would not be directly altered, and no ground disturbance is proposed. Compliance for any activities occurring within the Ellipse or Presidents Park South must be completed separately by that administrative unit and is not covered by this NAMA review.

This categorical exclusion determination is made consistent with the Department of the Interiors NEPA implementing procedures, including applicable provisions in 43 CFR Part 46 and the DOI NEPA Handbook. An extraordinary circumstances review was completed in accordance with 43 CFR 46.215, and no extraordinary circumstances were identified that would preclude use of the categorical exclusion, given the temporary and reversible nature of the activities, the absence of ground disturbance, the limited duration of effects, and the enforceable permit conditions and mitigation measures that protect park resources.

**Extraordinary Circumstances:**

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| A. Have significant impacts on public health or safety? | No | The proposed action involves a temporary permitted event that would require standard safety planning, crowd management, media coordination, emergency access, security screening, sanitation, and law enforcement |

15

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| | | presence. Temporary structures and operational features may include barriers, checkpoints, portable restrooms, generators, media support infrastructure, and temporary circulation controls, all of which are typical of large public events within the monumental core. The possible fireworks component at the Tidal Basin would require additional safety planning, exclusion zones, fire prevention measures, and operational controls if it proceeds.<br><br>Potential public health and safety issues include crowd concentration at the Lincoln Memorial, temporary traffic and access restrictions, generator use, sanitation demands, and pyrotechnic safety if fireworks occur. These issues are managed through the SUP process, interagency coordination, and event-specific operational requirements. Wastewater collection, hazardous materials controls, spill response, and emergency planning are included among the required mitigation measures. Because the event is temporary and subject to established safety and operational controls, the action would not result in significant impacts to public health or safety. |
| B. Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands; floodplains; national monuments; migratory birds; and other ecologically significant or critical areas? | No | The event would occur within highly managed commemorative landscapes and hardscape areas of West Potomac Park, the Lincoln Memorial Grounds, and the Tidal Basin. Potential natural resource impacts are limited to temporary turf stress, localized soil compaction, wildlife disturbance, temporary noise and lighting effects, and short-term waste and stormwater concerns associated with event use and support infrastructure. The project description includes resource protection measures such as turf and tree protection, wildlife monitoring, waste controls, stormwater stabilization, and hazardous materials containment.<br><br>The NHPA review indicates that no ground disturbance is proposed, which substantially reduces the potential for impacts to soils, root zones, and subsurface resources. The possible fireworks component could produce short-term disturbance to birds and other wildlife around the Tidal Basin and temporary noise and atmospheric effects, but those effects would be brief and localized. With permit conditions and mitigation in place, the proposal would not significantly affect natural resources or unique geographic characteristics within the NAMA portfolio. |
| C. Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks? | No | The environmental effects associated with temporary public events, media events, security operations, and related support infrastructure in the monumental core are well understood. Temporary crowding, localized turf wear, short-term lighting and noise, waste generation, and reversible changes to the visual setting are predictable and manageable. The possible fireworks component introduces an additional short-duration disturbance factor, but |

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| | | fireworks displays are a familiar event type with established safety and environmental controls.<br><br>The action does not involve novel technology, permanent alteration, or unknown environmental processes. Based on the NHPA review, the temporary nature and limited duration of the proposed activities are central to the conclusion that effects remain reversible and not adverse. Accordingly, the proposal does not involve highly uncertain environmental effects or unique or unknown environmental risks. |
| **D.** Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects? | No | Issuance of the SUP would authorize only this temporary event and associated support activities within the defined NAMA footprint and event period. It would not authorize permanent facilities, future UFC events, or long-term changes in land use or infrastructure at the Lincoln Memorial, Tidal Basin, or other NAMA-managed areas. Any future event proposals would require independent review under NEPA, NHPA, and NPS permitting authorities.<br><br>Although the event is associated with broader America 250 programming, approval of this permit does not constitute a decision in principle to allow similar events in the future. Therefore, the action does not establish a precedent for future actions with potentially significant environmental effects. |
| **E.** Have a direct relationship to other actions that implicate potentially significant environmental effects? | No | The proposal references event components within the Ellipse and South Lawn; however, those areas fall under the jurisdiction of Presidents Park and are not covered by this NAMA compliance review. Within the NAMA portfolio, the federal action is limited to temporary event activities and support features at the Lincoln Memorial, Tidal Basin, and other identified locations. The permit does not authorize permanent construction, utility installation, or other major undertakings with potentially significant environmental effects.<br><br>To the extent the event is operationally linked to other America 250 activities or separate events in adjacent administrative units, those activities are subject to separate review and coordination. The NAMA action does not irreversibly commit the agency to additional actions beyond the temporary event period. Therefore, it does not have a direct relationship to other actions that would result in significant environmental effects. |
| **F.** Have significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by the bureau? | No | The APE includes portions of West Potomac Park and the Washington Monument Grounds and contains numerous historic properties and cultural landscapes, including the Lincoln Memorial, Lincoln Memorial Grounds, Reflecting Pool, Tidal Basin, Thomas Jefferson Memorial, and Washington Monument Grounds. The NHPA review |

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| | | confirms that historic properties, archeological resources, cultural landscapes, and ethnographic resources are present. Temporary infrastructure such as barriers, COWs/MEOWs, restrooms, media equipment, and staging may temporarily affect the setting and feeling of these resources, but no permanent modifications to historic structures are proposed and no ground disturbance is proposed.<br><br>NHPA review determined that the undertaking, as currently proposed, will result in No Adverse Effect on historic properties, and the project is proceeding through the Standard 4-Step Review with DC SHPO due to the scale and scope of the event. The NHPA assessment specifically states that security measures and temporary infrastructure will not be attached to historic structures or buildings and that any effects on setting are reversible. Required stipulations include full restoration of damaged resources, removal of all infrastructure at the end of the event, and avoidance of known archeological concerns for staging and laydown areas. Because effects to historic properties are temporary, reversible, and managed through permit conditions and ongoing NHPA review, the action would not result in significant impacts to National Register-listed or eligible properties. |
| G. Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species? | No | The event would occur within an intensively managed, urban commemorative landscape. Potential biological effects are limited to temporary disturbance from noise, lighting, crowds, and event support features. The possible fireworks component at the Tidal Basin may temporarily disturb birds and other wildlife using the Basin and adjacent areas, but those effects would be short in duration and localized. The action does not involve vegetation removal, habitat conversion, hydrologic modification, or permanent land alteration.<br><br>Wildlife monitoring and response procedures are included among the mitigation measures, and no designated critical habitat is identified in the project area. Because the anticipated effects are temporary and limited, the proposal would not result in significant impacts to listed species or designated critical habitat. |
| H. Significantly limit access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sacred sites? | No | The NHPA assessment indicates that there are no Native American sacred or culturally sensitive sites within the Area of Potential Effect. Although the event may include temporary closures, security zones, and controlled access within portions of the NAMA portfolio, those restrictions are related to short-term event management and do not affect identified Indian sacred sites or ceremonial access. Accordingly, this extraordinary circumstance is not triggered. |

18

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| **I.** Contribute to potentially significant effects resulting from the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or from other actions that promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act)? | No | The proposed action does not involve planting, grading, soil importation, or permanent ground disturbance that would create a substantial pathway for the spread of invasive species. Potential effects are limited to temporary turf stress or surface disturbance in heavily used areas. Those risks are addressed through turf protection measures, stabilization of newly exposed soils if needed, and restoration requirements at the conclusion of the event. Because the event is temporary and includes resource protection and restoration measures, it would not contribute to potentially significant invasive species effects. |

**Decision: I find that the action fits within the categorical exclusion(s) above. Therefore, I am categorically excluding the described project from further NEPA analysis. No extraordinary circumstances apply.**

**Superintendent Signature:** MICHAEL COMMISSO    Digitally signed by MICHAEL COMMISSO    Date: 2026.05.11 22:55:33 -04'00'    **Date:** _____

**National Mall & Memorial Parks**    Kevin Griess

**Superintendent Signature:** JOHN STANWICH    Digitally signed by JOHN STANWICH    Date: 2026.05.13 13:18:14 -04'00'    **Date:** _____

**White House & Presidents Park**    John Stanwich