**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SUSAN DOUGLAS, et al.,       ) | |
|           ) | |
|     Plaintiffs,         ) | |
|           ) | |
|       v.           ) | Case No. 26-cv-02016 (APM) |
|           ) | |
| NATIONAL PARK SERVICE, et al.,       ) | |
|           ) | |
|     Defendants.         ) | |
|           ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

### I.    INTRODUCTION

Plaintiffs Susan Douglas and Paul Romano move for a temporary restraining order (TRO) or expedited preliminary injunction to prevent Defendants[1] from using the South Lawn of the White House and the Lincoln Memorial as venues for an Ultimate Fighting Championship ("UFC") event that is scheduled to start on the evening of June 12, 2026.  For the reasons that follow, the motion is denied.

### II.    BACKGROUND

      *1.    UFC Freedom 250*

Mixed martial arts ("MMA") is a combat sport that blends fighting techniques from boxing, kickboxing, Brazilian jiu-jitsu, and other disciplines.  Compl. for Declaratory and Injunctive Relief, ECF No. 1 [hereinafter Compl.], ¶ 54.  The UFC promotes MMA fights and has by far the largest market share among such organizations.  *Id.* ¶ 58.  UFC fights famously take place in an

---

[1] Defendants are the National Park Service (NPS), Acting Director of the National Park Service Jessica Bowron, Regional Director of the National Capital Region of the National Park Service Jennifer T. Nersesian, the U.S. Department of the Interior, and Secretary of the Interior Doug Burgum.

"Octagon," an eight-sided enclosure marked by a six-foot-tall, vinyl-coated chain-link fence. *Id.* ¶ 60. Dana White is the President and CEO of the UFC. *Id.* ¶ 64. He also happens to be a long-time friend and supporter of President Donald J. Trump. *Id.*

The UFC is scheduled to host an MMA event called "UFC Freedom 250" on the White House's South Lawn on June 14, 2026. *Id.* ¶ 62. President Trump first proposed hosting such an event in July 2025 as part of a series of events celebrating the 250th anniversary of American independence. Defs.' Mem. in Opp'n to Pls.' Mot., ECF No. 11 [hereinafter Defs.' Opp'n], at 10; Defs.' Opp'n, Decl. of Jessica Bowron, Comptroller of NPS, ECF No. 11-3 [Bowron Decl.], ¶ 8. The UFC confirmed its participation shortly thereafter. Defs.' Opp'n at 10. The event coincides with President Trump's 80th birthday. Compl. ¶ 65.

Although promoted as a 250th anniversary event, neither the congressionally authorized planning commission nor the President's corresponding task force established by executive order, named "Freedom 250," is involved in planning UFC Freedom 250. *See* Pls.' Emergency Appl. for a TRO or, in the Alternative, an Expedited Prelim. Inj., ECF No. 3 [hereinafter Pls.' Mot.], Pls.' Mem. of P. & A. in Supp. of Pls.' Mot., ECF No. 3-1 [hereinafter Pls.' Mem.], at 13–14; Celebrating America's 250th Birthday, 90 Fed. Reg. 8849, 8849 (Jan. 29, 2025). Earlier reporting had indicated control by Freedom 250, but a spokesperson denied involvement on June 4, 2026. Pls.' Mem. at 14.

On May 26, 2026, construction of a 92-foot-tall, 154-foot-wide staging structure, known as "the Claw," began on the South Lawn of the White House. Compl. ¶¶ 70–72. The Claw will house the Octagon and provide vantage points for cameras and lighting. *Id.* ¶ 74. The Claw is a temporary structure—disassembly is set to begin at 10:00 the morning after the event. Defs.' Opp'n, Decl. of Joshua Fisher, Director for White House Management and Administration,

ECF No. 11-4 [hereinafter Fisher Decl.], ¶ 8.  Recently, however, President Trump suggested in a TikTok video that the Claw may "never" be taken down.  Compl. ¶ 75.

The UFC also will hold smaller events before the fights.  On June 12, the UFC will hold a press conference at the Lincoln Memorial, which will include "face-offs" between fighters.  Defs.' Opp'n, Decl. of Marisa Richardson, Chief of the National Mall and Memorial Parks Division of Permits Management, ECF No. 11-2 [hereinafter Richardson Decl.], ¶ 14; Suppl. Decl. of Marisa Richardson, ECF No. 12 [hereinafter Suppl. Richardson Decl.], ¶ 5.  The face-offs and the press conference will occur within the area between the Lincoln Memorial and the reflecting pool.  Richardson Decl. ¶ 16.  Fighters involved in the face-offs will walk through and emerge from the Lincoln Memorial chamber accompanied by a child and descend the steps immediately in front of the statue of President Lincoln to a staging area.  Suppl. Richardson Decl. ¶ 6.  The UFC plans to use sound amplification equipment for the press conference.  *See* Compl. ¶ 92. The resulting sound may be audible at the nearby Vietnam Veterans Memorial.  *Id.* ¶ 93.  Then, on June 13, the UFC will hold "weigh-ins" at the Ellipse.  Richardson Decl. ¶ 14; Suppl. Richardson Decl. ¶ 5.  The staging for these two events is also temporary.  The UFC is expected to remove all equipment from the Lincoln Memorial by June 14, 2026, and from the Ellipse by June 23, 2026.  Richardson Decl. ¶ 21.

All three events have required intensive planning.  The UFC has invested over $60 million in total.  Fisher Decl. ¶ 15.  More than 700 subcontractors have been hired to assist with construction.  *Id.* ¶ 11.  The White House and Secret Service have screened and cleared both thousands of individuals to participate and hundreds of truckloads of equipment.  *Id.* ¶¶ 10, 13. And the athletes "began physical preparations months in advance."  *Id.* ¶ 14.  Come June 14, about

3

4,000 guests are expected to attend UFC Freedom 250 on the South Lawn and an additional 120,000 spectators are expected to watch from the Ellipse. *Id.* ¶¶ 9, 15.

### 2. Plaintiffs' Challenge

Plaintiffs are longtime residents of the Washington, D.C. area. *See* Pls.' Mot., Decl. of Susan Douglas, ECF No. 3-2 [hereinafter Douglas Decl.], ¶ 2; Pls.' Mot., Decl. of Paul Romano, ECF No. 3-3 [hereinafter Romano Decl.], ¶ 4. Douglas visits the White House grounds and Lincoln Memorial "very frequently," but construction of the Claw and other UFC Freedom 250 structures has diminished her enjoyment of these places. *Id.* ¶¶ 3, 7–10. Douglas also suffers from osteoarthrosis in her knees, and the closures put in place during construction "have caused [her] to have to take circuitous routes" when walking nearby. *Id.* ¶¶ 11–14. As an activist and organizer focused on "preserving the physical beauty and cultural sanctity of our national capital and its monuments," she plans to visit both locations for protests on June 13 and 14. *Id.* ¶¶ 4–6. She believes street closures will impact these activities, too, as they will make it more difficult for her and others to transport the large props they intend to bring with them. *Id.* ¶¶ 15–16.

Romano regularly travels past the same areas for his work as a rideshare driver and when he drives to visit his family. Romano Decl. ¶ 5. He similarly values the "aesthetic beauty and coherence of President's Park,[2] the White House, and the monuments on the National Mall." *Id.* ¶ 18. As a Vietnam War veteran, Romano attaches particular significance to the Vietnam Veterans Memorial. *Id.* ¶¶ 2, 5–6. He worries that the sound amplification equipment used for the press conference will disturb its "quiet tranquility," which is a "powerful aspect[]" of the Memorial. *Id.* ¶¶ 7, 10–12. He avers that "[t]here is a high likelihood" he will be near these locations again on June 13 and 14. *Id.* ¶¶ 15, 17.

---

[2] President's Park is the area consisting of the White House and its grounds, including the South Lawn, Lafayette Park, and the Ellipse. Compl. ¶ 25. The National Park Service has oversight responsibility for President's Park. *Id.* ¶ 27.

Plaintiffs filed this action on June 6, 2026, *see* Compl., six days before UFC Freedom 250 kicks off at the Lincoln Memorial.  They ask to the court to stop it from happening.[3]  Plaintiffs advance four grounds.  First, they allege UFC Freedom 250 runs afoul of restrictions on hosting "special events"—such as "sporting events"—on White House grounds and in certain parts of the Lincoln Memorial.  *See* Compl. ¶¶ 161–175 (citing 36 C.F.R. § 7.96(g)).  Second, they assert that the Claw was unlawfully constructed without congressional authorization.  *See id.* ¶¶ 176–186 (citing 40 U.S.C. § 8106).  Third, they claim Defendants' failure to prepare a report evaluating the events' potential environmental impacts violates the National Environmental Policy Act (NEPA).  *See id.* ¶¶ 187–198 (citing 42 U.S.C. § 4332(C)).  Finally, they allege that Defendants' actions are "*ultra vires* and in excess of delegated powers."  *See id.* ¶¶ 199–202.

## III.    LEGAL STANDARD

TROs and preliminary injunctions are "extraordinary" remedies.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A party moving for either must make four showings: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of emergency relief, (3) the balance of equities supports emergency relief, and (4) emergency relief is in the public interest.  *Id.* at 20.  Where, as here, the government is the opposing party, the last two factors "merge."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## IV.    DISCUSSION

The court first evaluates whether Plaintiffs are likely to succeed in demonstrating standing to bring suit.  At least one of them must have standing to maintain their suit in federal court. The court then considers whether Plaintiffs have demonstrated irreparable harm absent emergency

---

[3] In moving for emergency relief, Plaintiffs challenge only the events occurring at the Lincoln Memorial and the South Lawn, but not on the Ellipse.  *See* Pls.' Notice of Correction & Stmt. of Further Compliance with LCvR 65.1(a), ECF No. 7, ¶ 7.

relief.  Finally, it weighs the equities.  Concluding that Plaintiffs have not satisfied their burden as to these elements, the court does not reach the merits.

### A.    Likelihood of Success in Demonstrating Standing

As part of establishing a likelihood of success, Plaintiffs "must show a 'substantial likelihood' of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912–13 (D.C. Cir. 2015) (citation omitted).  To have standing, Plaintiffs must satisfy three requirements: (1) "an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of," in that the injury must be "fairly traceable" to Defendants' conduct; and (3) "redress[ability] by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).  Plaintiffs fail at the first.

*Aesthetic and Dignitary Injuries.*  Plaintiffs rest primarily on alleged aesthetic injuries. An aesthetic injury ordinarily is the loss of enjoyment that a plaintiff experiences at a particular location due to some government action.  *See, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972).  It is well established that aesthetic injuries can satisfy the injury-in-fact requirement. *See id.* at 734.  But a "generalized grievance" is not enough.  *Lujan*, 504 U.S. at 575 (internal quotation marks omitted).  Plaintiffs must be "directly affected" by the alleged actions, in that they have "concrete plans" to "return to the places they had visited before," *id.* at 563–64, and that their injury is more than "mere incidental viewership of something unappealing," *Env't Def. Fund v. FERC* (*EDF*), 2 F.4th 953, 970 (D.C. Cir. 2021).

Both Plaintiffs aver that they regularly observe the White House and Lincoln Memorial and cherish them for their beauty.  Douglas Decl. ¶¶ 3–4; Romano Decl. ¶¶ 5, 18.  And they say that the Claw—which they describe as "hideous," "grotesque," and "disgusting"—and other

structures built for UFC Freedom 250 will continue to "diminish the personal enjoyment" and "experience of beauty" associated with viewing the monuments over the coming days. Douglas Decl. ¶¶ 8–10; Romano Decl. ¶¶ 17–19. This is an ostensible injury to their aesthetic interests. But Plaintiffs fall short of showing they are "directly affected" by Defendants' actions.

Start with Romano. He states that there is a "high likelihood" that he will be "by" both the White House and Lincoln Memorial on June 13 and 14 because of his "work as a driver." *See* Romano Decl. ¶¶ 15, 17. He does not say, however, that there is any likelihood, even a "high" one, that he will be "by" the Lincoln Memorial on *June 12*, when the press conference and face-offs are scheduled to occur. As for the fight itself, Romano does not assert "concrete plans" to be near the South Lawn of the White House. Only a serendipitous rideshare trip would place him in a position to see the Claw on the night of the fights. A "threatened injury must be certainly impending to constitute injury in fact." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (internal quotation marks omitted). Romano's allegations do not meet that threshold.

Douglas, meanwhile, arguably has more definite plans to be at both the Lincoln Memorial and White House for upcoming protests on June 13 and 14 (although she, too, has not said that she will be visiting the Lincoln Memorial on June 12). Douglas Decl. ¶ 6. She alleges that, while protesting, she "expect[s] to observe" the structures on the South Lawn and National Mall. *Id.* ¶ 7. But unlike cases in which courts have found aesthetic injuries sufficient for standing, Douglas does not plan to visit the White House or the Lincoln Memorial in the coming days *for* their aesthetic value. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181–85 (2000); *Sierra Club v. FERC*, 827 F.3d 59, 66 (D.C. Cir. 2016); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1157–58 (D.C. Cir. 2025). Rather, she plans to be there primarily to protest the events. Douglas Decl. ¶ 6. The aesthetic-injury cases that Plaintiffs

7

cite are thus inapposite.  *See* Pls.' Mem. at 27–28 (citing cases); *see also* Pls.' Reply in Supp. of Pls.' Mot, ECF No. 13 [hereinafter Pls.' Reply], at 11–12 (citing cases).  None involve, as here, a plaintiff whose aesthetic injury is *subordinate* to the purpose for which they plan to visit the affected area.  *Cf. EDF*, 2 F.4th at 970 ("[W]e can find nothing in the existing case law to suggest that a person who incidentally views something unpleasant has suffered an injury-in-fact for purposes of standing.").  Plaintiffs thus have not satisfied their burden at this stage to show a substantial likelihood of a cognizable aesthetic injury.

Plaintiffs' alternative framing of their injuries fares no better.  Plaintiffs assert that "[i]t is the for-profit nature of the event that creates the aesthetic and dignitary harms that confer standing."  Pls.' Reply at 16.  They state that, "as individuals who care deeply about preserving the physical beauty and cultural sanctity of the national capital and its monuments, they will be harmed by the use of those for corrupt purposes."  *Id.* at 11; *see also* Pls.' Mem. at 28.  But "general emotional harm, no matter how deeply felt, cannot suffice for injury-in-fact for standing purposes." *Humane Soc'y of U.S. v. Babbitt*, 46 F.3d 93, 98 (D.C. Cir. 1995) (internal quotation marks omitted).  Once again, Plaintiffs must be "directly affected" by the challenged action.  *Lujan*, 504 U.S. at 564.  Neither Plaintiff has "concrete plans" to be present for the press conference and face-offs at the Lincoln Memorial on June 12; they speak only to their plans on June 13 and 14. *See* Douglas Decl. ¶ 6; Romano Decl. ¶¶ 15, 17.  And each Plaintiff's allegations as to the South Lawn on June 14 fail for the reasons already described.

Romano also alleges distinct dignitary and emotional harms from the activities at the Lincoln Memorial and the potential disturbance of the tranquility of the nearby Vietnam Veterans Memorial.  *See* Romano Decl. ¶¶ 12, 16.  Here, too, his failure to allege that he will be present at

either monument renders his grievance a "generalized" one insufficient for standing.  *See Lujan*, 504 U.S. at 575.

*Physical Harm.*  In her declaration and in the background section of Plaintiffs' opening brief, Douglas references how road closures associated with construction will cause her both physical injuries and, relatedly, inhibit her ability to participate in protests.  *See* Douglas Decl. ¶¶ 11–16; Pls.' Mem. at 23–24.  But Plaintiffs do not devote any of their argument in their opening brief to explaining how this injury confers standing.  *See* Pls.' Mem. at 26–29.  That is enough to dispose of it, notwithstanding a brief mention in their reply.  *See* Pls.' Reply at 12; *Strobos v. RxBio, Inc.*, 221 F. Supp. 3d 21, 23 (D.D.C. 2016) (noting both that arguments undeveloped and "unsupported by pertinent authority" and arguments raised for the first time in reply are waived (citing cases)).

Still, the court would not find these injuries sufficient for standing.  An injury in fact cannot be conjectural—it must be "definable and discernible." *Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 667 (D.C. Cir. 1987).  Plaintiff alleges that the "circuitous routes" the event-related road closures cause her to take "will continue to magnify the pain [she] suffers."  Douglas Decl. ¶ 14.  But Plaintiff offers little more detail.  Plaintiff suffers from a pre-existing, "painful" condition in both knees.  *Id.* ¶ 13.  She does not specify the added distance she will have to walk due to UFC Freedom 250–related road closures; nor does she elaborate on how walking that additional distance will affect her, except to assert some unspecified increase in pain.  *Id.*  Such claimed injury is not sufficiently "definable and discernable."  Plaintiffs cite no case in which such nondescript allegations suffice for a cognizable injury.

As for her ability to participate in protests, Plaintiff alleges that the props she intends to bring with her "are heavy and are already difficult to move because of [her] osteoarthritis."  *Id.*

¶ 16.   She does not claim, however, that this difficulty cannot be easily overcome, such as by having another protestor carry the prop she intends to use.  Where "an easy means for alleviating the alleged" injury exists, a plaintiff has not alleged a cognizable injury.  *See Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006).  Plaintiffs accordingly have not shown a substantial likelihood that either injury associated with the road closures can support their standing to sue.

   *Procedural Injury.*  Finally, Plaintiffs allege a procedural injury under NEPA.  They allege that, had Defendants gone through the process of preparing an environmental impact statement, Plaintiffs would have submitted comments opposing the project.  Douglas Decl. ¶¶ 17–18; Romano Decl. ¶ 19.  "But deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."  *EDF*, 2 F.4th at 970 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)).  Because Plaintiffs have not otherwise alleged a concrete injury, the procedural injury alone cannot confer standing.  Plaintiffs' resulting failure to show a substantial likelihood of standing weighs against emergency relief.

## B.    Irreparable Harm

   Even if Plaintiffs had established standing, the court still would deny emergency relief because Plaintiffs have not proven irreparable harm.  To establish irreparable harm for purposes of obtaining injunctive relief, the movant must make two showings.  First, the injury must be "both certain and great."  *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  That is, the alleged harm must "be actual and not theoretical" and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'"  *Id.* (alteration in original) (citation omitted).  Second, the harm "must be beyond remediation."  *League of Women Voters of U.S. v.*

10

*Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (citation omitted).  If a movant fails to demonstrate irreparable harm absent emergency relief, that is "sufficient" grounds on which a court may deny the motion.  *See CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

Plaintiffs' unreasonable delay in filing suit, though not dispositive, undercuts their claims of irreparable harm.  *See Benisek v. Lamone*, 585 U.S. 155, 159 (2018) ("[A] party requesting a preliminary injunction must generally show reasonable diligence."); *Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024) (observing that an "unexplained" "lack of diligence" "undercuts claims of irreparable harm"); *see also Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011) (holding that delay alone is not a valid basis to deny injunctive relief).  The public has known that the White House would be hosting a UFC fight event since President Trump first announced it in July 2025.  *See* Defs.' Opp'n at 10; Bowron Decl. ¶ 8.  Equipment and materials for the event began arriving at the White House around May 20, 2026, Fisher Decl. ¶ 20, and construction of the Claw began six days later, Compl. ¶ 70.  Plaintiffs, however, waited until June 7, 2026—more than two weeks after visible preparations commenced at the White House—to seek emergency relief.  Plaintiffs justify their delay based on newly received information.  They offer that they only recently learned that "no official semiquincentennial commission is planning, organizing, and executing the event,"—neither "America 250, the congressionally authorized commission" nor Freedom 250.  Pls.' Mem. at 13–14.  Specifically, a spokesperson for Freedom 250 confirmed on June 4, 2026, it "is *not* behind UFC Freedom 250."  *Id.* at 14; Compl. ¶ 103.  Plaintiffs add that their "aesthetic and dignitary harms" did not ripen until learning of the "corruption" throughout the entire organizational apparatus.  Pls.' Reply at 16.

11

The problem with Plaintiffs' explanation is that their suit does not rest solely on the claim that UFC Freedom 250's approvals are contrary to governing regulations. Count II protests Defendants' "decisions authorizing the construction of UFC Freedom 250 event facilities," which according to Plaintiffs, cannot be done without express congressional approval. Compl. ¶¶ 178–179. Count III contests Defendants' authorization of UFC Freedom 250 "without an environmental assessment or environmental impact statement," in contravention of NEPA. *Id.* ¶¶ 191–195. And Count IV challenges Defendants' authorization of the event as *ultra vires*. *Id.* ¶¶ 200–202. The timing of bringing these claims is not tethered to Plaintiffs' newfound understanding that Freedom 250 was not "planning, organizing, and executing the event." Plaintiffs explain away this observation by insisting that "[i]t is the for-profit nature of the event that creates the aesthetic and dignitary harms that confer standing." Pls.' Reply at 16. But the court does not see how that explains the delay. The for-profit elements of UFC Freedom 250 have long been known, and the absence of congressional approval and a NEPA review is not new information.

Plaintiffs' declarations confirm that their claimed aesthetic injuries likely existed before June 4, 2026. Romano states he "travel[s] along the National Mall and past the Lincoln Memorial several times a week," Romano Decl. ¶ 5, and that he saw the Claw "under construction on the White House lawn ten to fifteen times," *id.* ¶ 17. Douglas offers similar facts. She estimates visiting "the White House and National Mall areas at least one time per week since this spring," Douglas Decl. ¶ 5, and she has "observed the construction connected with UFC Freedom 250, including in particular the so-called 'Claw,'" during "recent past visits to the White House," *id.* ¶ 7. Plaintiffs' claimed aesthetic injuries therefore likely accrued not long after construction of the Claw began on May 26, yet they waited nearly two weeks to file suit. In the context of an

12

emergency application—and coupled with the fact that the UFC fight date was long ago known—it is fair to say Plaintiffs unreasonably delayed bringing suit, undercutting their claims of irreparable harm. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975).

Plaintiffs' asserted harms also are not irreparable because they are both ancillary and temporary. *See* Pls.' Mem. at 34–35; Pls.' Reply at 16–17. As discussed, neither Plaintiff claims they will be in the vicinity of the White House or Lincoln Memorial for the primary purpose of enjoying their architectural grandeur, natural beauty, or historical import. Rather, Romano's reason is work-related, and Douglas's is to exercise her First Amendment rights. *See* Romano Decl. ¶¶ 15, 17; Douglas Decl. ¶ 6. Their claimed aesthetic harms are thus ancillary to the main reasons for their presence. Their harms are also decidedly temporary. The Claw will be disassembled beginning at 10:00 a.m. on June 15, 2026. Fisher Decl. ¶ 8. And any staging equipment at the Lincoln Memorial must be removed before then. *See* Richardson Decl. ¶ 21. The President's musings about permanency of the Claw does not move the dial in the face of a White House official's clear representation. Fisher Decl. ¶ 8. Such ancillary and ephemeral harm is not sufficiently "great" to warrant extraordinary relief. *See Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969). And as discussed below, any significant environmental damage is doubtful.

### C.    Equities and Public Interest

The equities and the public interest "merge" where, as here, the opposing party is the government. *See Nken*, 556 U.S. at 435. They, too, weigh against the requested emergency relief. Plaintiffs offer two arguments. Because the agency action authorizing the event was "unlawful," Defendants cannot claim a "legitimate interest in authorizing or otherwise allowing an event and a construction project that their own regulations and federal statutory law both forbid." Pls.' Mem. at 35. And second, they argue that they "and the public have a profound interest in protecting" the

13

President's Park, National Mall, and Lincoln Memorial from "unauthorized, commercial exploitation and from the environmental damage inflicted on them." *Id.* Neither contention is persuasive.

As to the former, the public concededly has an interest in the Executive Branch's compliance with the law. But that public interest also extends to courts resolving disputes only when Article III's "case or controversy" requirement is satisfied. *Cf. Warth v. Seldin*, 422 U.S. 490, 498 (1975) (discussing standing limitations as "founded in concern about the proper—and properly limited—role of the courts in a democratic society"). As discussed, Plaintiffs have not established a substantial likelihood of standing. *See supra* Section IV.A. The public interest weighs against the court wading into a dispute when jurisdiction is less than certain.

As to the latter, the court agrees that the public has an interest in preventing the "unauthorized, commercial exploitation" and "environmental damage" of protected national landmarks. But again, given doubtful standing, the public interest weighs against deciding these issues. As for the environmental damage, Plaintiffs have not identified any environmental harm that would come from the press conference and face-offs at the Lincoln Memorial. *See* Pls.' Mem. at 12, 35; Pls.' Reply at 17–18. And the UFC estimates it will spend $700,000 to remediate grass damaged by the Claw on the South Lawn. *See* Pls.' Mem. at 20 (citing Mary Whitfill Roeloffs, *90-Degree Heat Expected for Trump's UFC Fight—And Maybe Rain*, Forbes (Jun. 10, 2026, at 3:34 PM ET), https://perma.cc/87T7-QNXX). The risk of any significant environmental damage therefore appears remote.

On the other side of the ledger, a grant of emergency relief on the eve of UFC Freedom 250 would cause substantial harm to other interests. Defendants point to the considerable "time, labor, and funding" that has gone into organizing the UFC fight and lead-up events. *See* Defs.'

14

Opp'n at 10–13, 17–18; Fisher Decl. ¶¶ 9–15.  Specifically, they point to the near year-long planning of the event; coordination with multiple government agencies, including the Secret Service; site work that began May 20 and has involved between 700 to 900 workers; multiple equipment deliveries; event ticketing logistics; and preparations of the contracted UFC fighters. Defs.' Opp'n at 17–18.  Defendants also point to the reliance interests of thousands of expected spectators, some of whom have planned visits to the District of Columbia, and "millions of Americans watching remotely." *Id.*  And then there is the $60 million that the UFC and UFC-affiliated organizations have expended to put on the event.  Fisher Decl. ¶ 15.  The potential loss of those dollars resulting from a last-minute, court-ordered stoppage cannot be ignored.  *Cf. Gulf Restoration Network v. Haaland*, 47 F.4th 795, 804–05 (D.C. Cir. 2022) (considering private actors' dollars invested and potential losses in determining whether to vacate an administrative action).  The balance of the equities therefore also weighs against emergency relief.

## IV.    CONCLUSION AND ORDER

Because Plaintiffs fail to establish both a substantial likelihood of standing and irreparable harm, and because the equities and public interest weigh against emergency relief, Plaintiffs' Emergency Application for a Temporary Restraining Order or, in the Alternative, an Expedited Preliminary Injunction, ECF No. 3, is denied.

Dated:  June 12, 2026

Amit P. Mehta
United States District Judge

15